STATE OF CONNECTICUT *v.* MICHAEL REDDICK
(11181)

PETERS, C. J., HEALEY, DANNEHY, SANTANIELLO and CALLAHAN, Js.

Argued May 3—decision released August 6, 1985

*Sue L. Wise,* with whom, on the brief, were, *John R. Williams* and *Elizabeth M. Inkster,* for the appellant (defendant).

*Peter Nussbaum,* legal intern, with whom was *Guy W. Wolf III,* assistant state's attorney, and, on the brief, *Arnold Markle,* state's attorney, for the appellee (state).

CALLAHAN, J. The defendant, Michael Reddick, was convicted of first degree robbery and of assault of a victim sixty or older in the third degree, in violation of General Statutes §§ 53a-134 (a) (4) and 53a-61a (a),[1] respectively, and was sentenced to an effective term of imprisonment of not less than nine nor more than eighteen years. He appeals from the judgment of conviction, claiming that his rights under the state and fed-

---

[1] "[General Statutes] Sec. 53a-134. ROBBERY IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of robbery in the first degree when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime: (1) Causes serious physical injury to any person who is not a participant in the crime; or (2) is armed with a deadly weapon; or (3) uses or threatens the use of a dangerous instrument; or (4) displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm; except that in any prosecution under this subdivision, it is an affirmative defense that such pistol, revolver, rifle, shotgun, machine gun or other firearm was not a weapon from which a shot could be discharged. Nothing contained in this subdivision shall constitute a defense to a prosecution for, or preclude a conviction of, robbery in the second degree, robbery in the third degree or any other crime.

"(b) Robbery in the first degree is a class B felony provided any person found guilty under subdivision (2) of subsection (a) shall be sentenced to a term of imprisonment of which five years of the sentence imposed may not be suspended or reduced by the court."

"[General Statutes] Sec. 53a-61a. ASSAULT OF A VICTIM SIXTY OR OLDER IN THE THIRD DEGREE. CLASS A MISDEMEANOR. (a) A person is guilty of assault of a victim sixty or older in the third degree, when he commits assault in the third degree under section 53a-61 and the victim of such assault has attained at least sixty years of age or is blind or physically disabled, as defined in section 1-1f.

"(b) No person shall be found guilty of assault in the third degree and assault of a victim sixty or older in the third degree upon the same incident of assault but such person may be charged and prosecuted for both such offenses upon the same information.

"(c) Assault of a victim sixty or older in the third degree is a class A misdemeanor."

eral constitutions were violated by: (1) the court's failure to require the state to produce allegedly exculpatory material; (2) a witness' invocation of his fifth amendment privilege against self-incrimination during direct examination by the prosecutor; (3) the state's introduction of evidence regarding the defendant's pretrial incarceration; and (4) alleged errors in the court's jury instructions.[2] We find no error.

The jury could reasonably have found the following facts: On June 24, 1980, at approximately 10:30 a.m., the Jackson-Marvin Hardware Store at 843 Whalley Avenue in New Haven was robbed by a black male carrying what appeared to be a sawed-off shotgun. The perpetrator initially went to a side office in the store and inquired of a bookkeeper, Esther Woodward, whether duplicate keys were made on the premises. After receiving an affirmative response, he left, but returned in a few minutes, displayed the gun, and began taking money from an open drawer in Woodward's desk. At that point, Martin Daniell, a seventy-five year old employee of the store, intervened. The robber struck Daniell with the gun on the shoulder and forehead, and then fled. While fleeing, the perpetrator encountered a cashier, Jill Harrison, in an aisle in the store and pushed her aside. Upon leaving the store, he entered a car which was parked in front and left the area. A customer, Joseph Puglisi, who was at the entrance of the store, saw the robber get into the car and noted the license plate number. The car, which was a stolen vehicle, was later found abandoned.

On July 10, 1980, Esther Woodward, the bookkeeper, and Jill Harrison, the cashier, independently viewed police photographic displays containing pictures of black males and identified the defendant as the man

---

[2] The defendant raised a fifth claim of error concerning the trial court's denial of his motion in limine regarding the admission at trial of evidence of his prior convictions. This claim was abandoned at oral argument.

who had robbed the hardware store on June 24, 1980. The defendant was arrested and later tried before a jury. At the trial, Woodward testified that she was 90 percent sure of her photographic identification. She also testified that she was 90 percent sure that the defendant, whom she identified in the courtroom, was the man who had robbed the store. Harrison testified that she had picked out photographs of other black males as appearing similar to the defendant before she selected the defendant's photograph as that of the robber. In the courtroom, Harrison identified the defendant as the robber and testified that she was absolutely sure of her in-court identification. A note from the jury during the course of its deliberations indicated that it considered identification to be the critical issue in the case and that it was troubled by the evidence in that regard.[3]

## I

The defendant first claims that he was denied due process of law and the effective assistance of counsel because prior to trial the state failed to disclose, and the trial court denied motions to obtain, allegedly exculpatory information, namely, the failure of several eyewitnesses to the robbery to identify the defendant as the robber. There were two individuals other than Woodward, Harrison, Daniell and Puglisi in the Marvin-Jackson Hardware Store on the morning of June 24, 1980, at the time of the robbery. They were James Bethune, an employee of the store, and a customer, Paul Gagliardi. The defendant asserts that the pretrial photographic identifications supplied by Woodward and Harrison constituted "the *only* evidence against him." He argues that under these circumstances, the inability of the other four eyewitnesses to identify him was

---

[3] The jury's note read as follows: "The only evidence we feel is of concrete value is the identifications by the two witnesses as mentioned before and we disagree on the credibility of this identification. Is the identification by photo of the Defendant by witnesses sufficient evidence to convict?"

exculpatory material that the court should have required the state to produce prior to trial and that its failure to do so entitles him to a new trial. We disagree.

There is no indication in the record that either Bethune or Daniell ever attempted to make a pretrial photographic identification of the defendant. We have been unable to find any support for the undocumented assertion in the defendant's brief that Bethune had an opportunity to view the robber, and we note that he was not called to testify at the trial. Daniell, who had extremely poor eyesight, could not make an identification, and told the police so immediately after the robbery. Although Daniell testifed at the trial, he was not asked to make an in-court identification of the defendant.

Gagliardi and Puglisi, however, both had an opportunity to view the robber as he ran from the store after the robbery. Each testified at trial that he had been shown photographs by the police in an unsuccessful attempt to elicit an identification of the robber. Gagliardi testified that the defendant looked similar to the person he had seen fleeing from the store, but that he could not be certain of an identification. Puglisi testified that he could have identified the man soon after the robbery, but did not think he could recognize him at the time of trial. He was not asked to make an in-court identification. Neither the identities of Gagliardi and Puglisi nor their inability to identify the defendant was revealed to the defendant prior to trial, despite requests for that information.

The record is unclear as to whether or not the photographic displays shown to Gagliardi and Puglisi contained a photograph of the defendant. If the defendant's picture was not among those displayed, then obviously each man's failure to make an identification of the defendant would not be exculpatory. If

the displays did contain a recognizable photograph of the defendant, however, the failure of the witnesses to identify the defendant might be exculpatory. In any case, both Gagliardi and Puglisi testified that they were unable to identify the defendant from photographs prior to trial or from viewing the defendant in person at the trial. Since the inability of these witnesses to make an identification of the defendant was disclosed at trial, this information, whether exculpatory or not, certainly was not suppressed.

"The rule of *Brady* v. *Maryland,* 373 U.S. 83, [83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963),] arguably applies in three quite different situations. Each involves the discovery, *after trial,* of information which had been known to the prosecution but unknown to the defense." (Emphasis added.) *United States* v. *Agurs,* 427 U.S. 97, 103, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976). "Indeed the standard developed in *Agurs* can only sensibly be applied to the suppression of evidence throughout the trial  . . . . " *United States* v. *McPartlin,* 595 F.2d 1321, 1346 (7th Cir. 1979). "Evidence known to the defendant or his counsel, or that is disclosed, even if during trial, is not considered suppressed as that term is used in *Brady. State* v. *Altrui,* 188 Conn. 161, 177, 448 A.2d 837 (1982); *State* v. *Perez,* 181 Conn. 299, 309, 435 A.2d 334 (1980); *State* v. *Grasso,* 172 Conn. 298, 303, 374 A.2d 239 (1977)." *State* v. *Dolphin,* 195 Conn. 444, 455–56, 488 A.2d 812 (1985).

Here, the nonidentification information was disclosed at trial. Gagliardi and Puglisi each testified as to his inability to identify the defendant either from photographs or in person. Since the jury was fully informed of the lack of an identification by these witnesses, the defendant can complain only of the timing of the disclosure and has no basis for a claim of suppression. See *Hudson* v. *Sowders,* 510 F. Sup. 124, 126 (W.D. Ky. 1981), aff'd, 698 F.2d 1220 (6th Cir. 1982). Under these

circumstances, the defendant bears the burden of proving that he was prejudiced by the state's failure to make the information available to him at an earlier time. *United States* v. *Stone,* 471 F.2d 170, 173–74 (7th Cir. 1972), cert. denied, 411 U.S. 931, 93 S. Ct. 1898, 36 L. Ed. 2d 391 (1973).

The defendant did not develop before the trial court or on appeal any specific way in which he was prejudiced by not being furnished, prior to trial, with information as to the inability of the witnesses to make an identification. In his brief, the defendant baldly asserts that because he was not informed of the nonidentification prior to trial, he was deprived of the opportunity to make an adequate investigation and was therefore denied the effective assistance of counsel. He fails to specify, however, in what way the discovery of this information before trial would have aided the preparation and presentation of his defense. Both Gagliardi and Puglisi testified at trial and were available for cross-examination. Gagliardi was not cross-examined at all by defense counsel, and Puglisi was asked only six brief questions on cross-examination. No request for a continuance was made after either witness testified. "The appropriate standard to be applied in a case such as this is whether the disclosure came so late as to prevent the defendant from receiving a fair trial." *United States* v. *McPartlin,* supra, 1346; *State* v. *Packard,* 184 Conn. 258, 277, 439 A.2d 983 (1981). After reviewing the record and the defendant's broad claims of prejudice, we cannot conclude that his lack of information prior to trial concerning the witnesses' inability to identify the defendant prejudiced him in any way or prevented him from obtaining a fair trial.

## II

The defendant next claims that by permitting a witness, John Manley, to invoke his fifth amendment priv-

ilege against self-incrimination, the trial court deprived the defendant of his constitutional rights to due process of law and to confront the witnesses against him. He also claims that the trial court, aware of Manley's intention to claim his fifth amendment privilege, improperly allowed the state to propound questions to Manley designed to elicit an invocation of the fifth amendment in the presence of the jury. This error, the defendant claims, violated his fifth and fourteenth amendment rights.

On November 21, 1980, John Manley, who was then incarcerated at the New Haven correctional center, wrote a letter to Judge John Reynolds, the presiding judge of the criminal court in New Haven, stating that he, not Michael Reddick, had robbed the Jackson-Marvin Hardware Store on June 24, 1980. On December 23, 1980, Manley appeared with counsel at a hearing on a motion to dismiss the information against the defendant. Manley testified at the hearing that he had committed the robbery and had acted alone. The details Manley related, however, did not square with what witnesses to the robbery had told the police. It is obvious from the record that the state did not believe that Manley was the culprit, but believed that he was, in fact, attempting by perjured testimony to exculpate the defendant. The defendant's motion to dismiss was denied.

At the defendant's trial in September, 1981, Manley, who was then incarcerated at Somers and had other serious charges pending against him, was called as a witness by the state. Initially, in response to a question on direct examination, Manley again testified that he had robbed the hardware store. The state then moved the court to make him a hostile witness, to which the defendant objected, and the court excused the jury to hear counsel's arguments. At this point, Manley, after consultation with his attorney, claimed that he

was confused as to the question. The court summoned the jury, informed it that Manley had misunderstood the question and desired to withdraw his response, and instructed it to disregard the question and answer. The state's attorney then asked Manley, "[I]sn't that a fact that you did not commit that robbery?" The witness invoked his fifth amendment privilege in response to the question. The defendant voiced no objection.

Thereafter, the state, again without objection by the defendant, introduced the entire transcript of Manley's testimony from the December 23, 1980 hearing on the defendant's motion to dismiss, wherein Manley had testified that he had committed the robbery. Manley then responded to questions propounded by both the prosecutor and defense counsel. He testified freely on a number of points, admitting that he had written the letter of November 21, 1980, to Judge Reynolds and that he had previously testified that he had committed the robbery. Subsequent to his initial fifth amendment claim, Manley invoked the fifth amendment on eight other occasions, five times in response to questions asked by the assistant state's attorney and three times in response to questions asked by defense counsel. When invoked, it was in response to questions which would require Manley to directly admit again that he had committed the robbery, or which would establish that he had committed perjury at the hearing on December 23, 1980.

The defendant claims that Manley had knowingly waived his privilege against self-incrimination by his letter to Judge Reynolds and his prior testimony at the hearing on December 23, 1980, and that the trial court therefore erred in allowing Manley selectively to claim his privilege at the defendant's trial. Despite an indication to the contrary in the defendant's brief, the record is clear that the defendant did not raise this issue at trial. The defendant did not object at any time when

Manley invoked his fifth amendment privilege in response to questions by either the state or the defense. Further, the defendant never requested that the trial court order Manley to testify fully, strike Manley's prior testimony, or declare a mistrial on the ground that Manley had waived his fifth amendment rights. It appears that the defendant wanted Manley's previous admissions of responsibility for the robbery to go to the jury and desired to maintain friendly relations with him while he was on the stand. Now, having been convicted, the defendant claims that it was error for the trial court to neglect to do what the defendant never requested it do, that is, find that Manley had waived his testimonial privilege and require him to respond to all questions.

"Contrary to the impression which seems to prevail in some quarters, it is not true that defense counsel in criminal cases may through neglect, inattention or as a trial strategy refrain from making proper objection or raising in the trial court any available constitutional defenses, confident that if the outcome of the trial proves unsatisfactory without making objections and taking exceptions and raising any available constitutional issue they may still prevail by assigning error or raising the constitutional issue for the first time on the appeal." *State* v. *Evans,* 165 Conn. 61, 67, 327 A.2d 576 (1973); *State* v. *Kurvin,* 186 Conn. 555, 564, 442 A.2d 1327 (1982). "Only the most exceptional circumstances will save a claim, constitutional or otherwise, from the fatal consequences of a defendant's failure to make a timely objection." *State* v. *Baker,* 182 Conn. 52, 56, 437 A.2d 843 (1980). The defendant has suggested no exceptional circumstances to warrant departure from the general rule that limits appellate review of all issues, even constitutional issues, to those on which the trial court has had an opportunity to rule. Practice Book § 3063; *Knight* v. *Bourbeau,* 194 Conn.

702, 704 n.3, 485 A.2d 919 (1984); *Cain* v. *Moore,* 182 Conn. 470, 472, 438 A.2d 723 (1980), cert. denied, 454 U.S. 844, 102 S. Ct. 157, 70 L. Ed. 2d 129 (1981). Given the extent of the direct and cross-examination of Manley, and the fact that his pretrial testimony that he had committed the robbery was read in full to the jury, we cannot conclude that the record adequately supports a claim that the defendant has clearly been deprived of a fundamental constitutional right and a fair trial. *State* v. *Evans,* supra, 70. We therefore decline to consider this claim further.

On a related issue, the defendant claims that the trial court erred in denying his motion for a mistrial, in which he alleged that the state knowingly and repeatedly asked questions of Manley designed to elicit an invocation of the witness' fifth amendment privilege. In *Namet* v. *United States,* 373 U.S. 179, 83 S. Ct. 1151, 10 L. Ed. 2d 278 (1963), the United States Supreme Court addressed the issue of when a witness' claim of his privilege not to answer results in reversible error. The court outlined two aspects of the issue, each suggesting a distinct ground of error. "First, some courts have indicated that error may be based upon a concept of prosecutorial misconduct, when the Government makes a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege. . . . A second theory seems to rest upon the conclusion that, in the circumstances of a given case, inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant." Id., 186–87. The defendant bases his claim of error on both theories.

The record simply does not support the defendant's claim under either theory. Although there is some indication that the assistant state's attorney knew that Manley might attempt to invoke the fifth amendment

if questioned directly about his involvement in the robbery, there is nothing in the record upon which to base an inference of prosecutorial misconduct. "[T]he prosecutor need not accept at face value every asserted claim of privilege, no matter how frivolous." *Namet* v. *United States,* supra, 188. In this case the state might very well have believed, and indeed so indicated, that Manley would not be permitted to invoke his privilege against self-incrimination. The state reasoned, with some justification, that Manley had waived his testimonial privilege by testifying at the hearing on the defendant's motion to dismiss. Id. Further, a review of the record reveals that it was difficult to predict which questions Manley would refuse to answer. Generally, he testified quite freely and his claim of privilege was exercised erratically throughout his testimony. Throughout some seventy-seven pages of trial transcript, Manley claimed his fifth amendment privilege a total of six times in response to questions by the state. On this record, we cannot conclude that "these few lapses, when viewed in the context of the entire trial, amounted to planned or deliberate attempts by the [state] to make capital out of [Manley's] refusals to testify." Id., 189.

Nor is this a case where a witness' invocation of the fifth amendment lent critical weight to the state's case, as where the prosecutor uses the assertion of the privilege by an accomplice or someone linked to the defendant's crimes in order to build a case against the defendant. See *Douglas* v. *Alabama,* 380 U.S. 415, 85 S. Ct. 1074, 13 L. Ed. 2d 934 (1965).

"A prosecutor or state's attorney, in a criminal case, may not call anyone who, in any capacity, has become so involved in the defendant's criminal activities as to be liable to prosecution for the same offense or for another offense growing out of the transaction from which the defendant's alleged offenses arise, with a

design or purpose of extracting a claim of privilege against self-incrimination." *State* v. *Moynahan,* 164 Conn. 560, 586, 325 A.2d 199, cert. denied, 414 U.S. 976, 94 S. Ct. 291, 38 L. Ed. 2d 219 (1973). This rule is patently inapplicable to the present situation. The state, rather than claiming that Manley was liable to prosecution for the same or related crimes, maintained that Manley had nothing to do with the charged offense. Furthermore, both witnesses who had identified the defendant as the robber testified before the jury, upon questioning by the state, that they had viewed Manley and determined that he was not the perpetrator.

The defendant also claims that the trial court erred in failing to give a curative instruction concerning the effect on the defendant of Manley's invocation of the fifth amendment, although no such instruction was ever requested. Under these circumstances, we will not find error in the trial court's failure, sua sponte, to take some affirmative action. *Namet* v. *United States,* supra, 190.

### III

The defendant next claims that the trial court erred in denying his motion for a mistrial, grounded upon the state's introduction of testimony that the defendant had been incarcerated prior to trial. The circumstances giving rise to this claim are as follows: Jill Harrison, a witness for the state, identified the defendant as the man who had committed the June 24, 1980 robbery. She also testified that she was certain she had again seen the robber in the hardware store after the robbery, in October of 1980. From a subsequent witness, John Manley, the state elicited testimony that the defendant had been incarcerated during October of 1980, and therefore could not have been in the hardware store at that time. The defendant moved for a mistrial on the ground that mention of the defendant's incarceration before the jury

was a due process violation because it undermined the defendant's presumption of innocence.

Not every reference to a defendant's pretrial incarceration is grounds for a mistrial. *State* v. *Hawthorne,* 176 Conn. 367, 371–74, 407 A.2d 1001 (1978). The rule in this state is that a motion for a mistrial should be granted only as a result of some occurrence during trial of such a character that it is apparent to the court that because of it, an accused cannot have a fair trial and the entire proceeding is tainted. Id., 372. Furthermore, the trial court has wide discretion in passing upon a motion for a mistrial, and the defendant bears the burden of proving that the testimony was so prejudicial that the defendant was deprived of the opportunity for a fair trial. Id.

There is nothing sacrosanct about a defendant's pretrial incarceration. As with a defendant's prior criminal record; *State* v. *Geyer,* 194 Conn. 1, 10–13, 480 A.2d 489 (1984); or participation in other crimes; *State* v. *Crosby,* 196 Conn. 185, 190, 491 A.2d 1092 (1985); evidence of incarceration is admissible if its probative value outweighs its prejudicial effect. The testimony elicited by the state of the defendant's incarceration was exculpatory and cast doubt on the identification testimony of an important prosecution witness. "[I]t is the duty of the state to ensure that all evidence tending to aid in ascertaining the truth be laid before the court, even though such evidence is not consistent with the prosecution's contention that the accused is guilty." *State* v. *Brown,* 169 Conn. 692, 696, 364 A.2d 186 (1975); *Merrill* v. *Warden,* 177 Conn. 427, 431, 418 A.2d 74 (1979).

The evidence of the defendant's incarceration in October of 1980 was highly probative on the critical element in the case, the identification of the defendant. It is inconceivable that it not be brought to the jury's atten-

tion. Since the information was properly before the jury, the trial court did not abuse its discretion by refusing to grant a mistrial because of its admission.

## IV

Finally, the defendant claims that he is entitled to a new trial because the jury instructions given by the trial court improperly diluted the presumption of innocence and relieved the state of its burden to prove all the elements of the crime beyond a reasonable doubt, in violation of the defendant's due process rights. Specifically, the defendant claims that the court's instructions concerning circumstantial evidence and the right of the jury to draw inferences,[4] when juxtaposed with its charge on intent,[5] permitted the jury to infer and

---

[4] The court's instructions on circumstantial evidence were as follows: "Now, proof beyond a reasonable doubt does not mean that you must have direct evidence supporting a fact. You may apply the rule of circumstantial evidence. This rule involves the offering of evidence of facts from which you're asked to infer the existence of another fact or a set of facts.

"Such an inference may be made provided two elements in the application in this rule are satisfied. First, that the fact from which you're asked to draw the inference has itself been proven beyond a reasonable doubt and, secondly, that the inference asked to be drawn is not only logical and reasonable, but it is strong enough so that you can find that it is more probable than not that the fact to be inferred is true.

"It is your right to draw inferences if you conclude that the facts you find proven reasonably establish other facts by reason and logic and are not the result of speculation, surmise or guesswork. If from the facts you find proven you reasonably do infer other facts, you may then use the facts so inferred as a basis for a further inference that other facts exist, including facts going to establish the guilt or innocence of the defendant."

[5] In charging the jury on robbery, the court gave the following instruction on the intent element of that offense: "Now, the intent referred to in that, under that provision, in effect, I instruct you that the intent ordinarily may not be proved directly and usually must be established by circumstantial evidence. This is because there exists no way of scrutinizing with certainty the state of mind of a human being, but you may infer intent from the surrounding circumstances.

"What an individual does or fails to do, whether it be physical, verbal or written conduct, may be indicative of intent or lack of intent to commit a criminal offense. You may consider all other facts and circumstances,

find proven the defendant's intent, an essential element of the crime of robbery, by a fair preponderance of the evidence rather than beyond a reasonable doubt.[6] We disagree.

It is axiomatic that the state is required to prove all the essential elements of the crimes charged beyond a reasonable doubt in order to obtain a conviction. *In re Winship,* 397 U.S. 358, 361, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). An instruction that dilutes the state's burden, or places a burden on the defendant to prove

---

all of the credible evidence properly before you in this case which may aid in determining the state of mind of the defendant.

"Ultimately it is for you and you alone as members of the jury to decide from the evidence believed by you whether the state has proved beyond a reasonable doubt that the defendant possessed at the time and place of this alleged commission of the offense charged the requisite intent to have committed the crime of larceny at that time and place."

[6] In addition, the defendant claims that two other statements made by the court during its jury instructions contributed to the alleged dilution of the state's burden of proof. In charging the jury on the presumption of innocence and explaining the meaning of the term "reasonable doubt," the court stated: "The presumption of innocence applies to all the elements necessary to constitute the offense charged, if there is more than one element and this shall be defined for you as to this case in a few moments. This presumption of innocence, however, does not have the effect of evidence itself. The *only* effect it has is to place upon the state the burden of establishing the element or elements necessary to prove guilt beyond a reasonable doubt.

"Now, a reasonable doubt is not a doubt that is raised by the questioning simply for the sake of a doubt, nor is it a surmise or a guess or speculation or a doubt not founded upon the evidence. It is not hesitation or arising from feelings of sympathy or pity for the accused or his family. A reasonable doubt is one that is based upon reason and which grows out of the evidence or lack of evidence in the case.

"A reasonable doubt is one that is reasonable in the light of all the evidence and one that is honestly entertained after a thorough evaluation, after careful examination of all the evidence in the case; an absolute demonstration of guilt is not required to convict. The demonstration of guilt need be *only* beyond a reasonable doubt; one that a reasonable person can reasonably entertain after a fair evaluation of all the evidence." (Emphasis added.) The defendant apparently objects to the court's use of the word "only" in explaining the effect of the presumption of innocence and defining the state's burden of proof.

his innocence, is unconstitutional. *Sandstrom* v. *Montana,* 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979).

It is well established, however, that individual instructions are not to be judged in artificial isolation from the overall charge. *State* v. *Dolphin,* 195 Conn. 444, 451, 488 A.2d 812 (1985); *State* v. *Reid,* 193 Conn. 646, 660, 480 A.2d 463 (1984); *State* v. *Hines,* 187 Conn. 199, 209, 445 A.2d 314 (1982). The whole charge must be considered from the standpoint of its effect on the jury in guiding them to a proper verdict; *State* v. *Corchado,* 188 Conn. 653, 660, 453 A.2d 427 (1982); *State* v. *Williams,* 182 Conn. 262, 269, 438 A.2d 80 (1980); *State* v. *Piskorski,* 177 Conn. 677, 746–47, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979); and not critically dissected in a microscopic search for possible error. *State* v. *Harris,* 172 Conn. 223, 226–27, 374 A.2d 203 (1977).

In this case, the trial court instructed the jury on at least twelve occasions that it was the state's burden to prove all the elements of the crimes charged, including intent, beyond a reasonable doubt. The court also informed the jury several times that the defendant did not have to prove his innocence, and that it was for the state to establish his guilt. The court repeated its instructions on the state's burden to prove intent beyond a reasonable doubt in charging the jury on the elements of assault. It was thus made abundantly clear to the jury that the burden of proof as to every element of the offenses charged was on the state, and that this burden had to be satisfied beyond a reasonable doubt. On this record, it is not reasonably possible that the jury was misled by the alleged errors in the court's instructions. *State* v. *Orsini,* 187 Conn. 264, 276–77, 445 A.2d 887, cert. denied, 459 U.S. 861, 103 S. Ct. 136, 74 L. Ed. 2d 116 (1982); *State* v. *Mason,* 186 Conn. 574, 586–87, 442 A.2d 1335 (1982); *State* v. *Ruiz,* 171

Conn. 264, 273, 368 A.2d 222 (1976); *State* v. *Rose,* 169 Conn. 683, 687–88, 363 A.2d 1077 (1975).

The defendant claims that a case recently decided by the United States Supreme Court, *Francis* v. *Franklin,* 471 U.S. 307, 105 S. Ct. 1965, 85 L. Ed. 2d 344 (1985), requires a different result. We disagree. In *Francis,* the United States Supreme Court held that "[b]ecause a reasonable juror could have understood the challenged portions of the jury instruction . . . as creating a mandatory presumption that shifted to the defendant the burden of persuasion on the crucial element of intent, and because the charge read as a whole does not explain or cure the error . . . the jury charge does not comport with the requirements of the Due Process Clause." Id., 1977. In that case, however, the jury was specifically instructed that " '[a] person of sound mind and discretion is presumed to intend the natural and probable consequences of his acts, but the presumption may be rebutted.' " Id., 1972. Here the defendant does not claim that the burden of proof was shifted, but merely that the state's burden was watered down. That defect, if it existed, was cured by the court's repeated correct instructions. Furthermore, in *Francis* v. *Franklin,* supra, the defendant's sole defense to the charge of malice murder, a capital offense in Georgia, where he was tried, was a lack of the requisite intent to kill. Id., 1969. In the case before us, intent was not a disputed element; identification was the only contested issue. The actions of the robber and his display of what appeared to be a sawed-off shotgun dispelled any notion that he might have been in the Jackson-Marvin Hardware Store shopping for nuts and bolts.

There is no error.

In this opinion the other judges concurred.