STATE OF CONNECTICUT *v.* JOSEPH SILVA
(12611)

PETERS, C. J., HEALEY, DANNEHY, SANTANIELLO and CALLAHAN, Js.

Argued June 3—decision released August 26, 1986

*Sanford J. Plepler,* special public defender, with whom, on the brief, was *Stephen Fournier,* for the appellant (defendant).

*Carl Schuman,* assistant state's attorney, with whom were *James Thomas,* assistant state's attorney, and, on the brief, *John M. Bailey,* state's attorney, for the appellee (state).

DANNEHY, J. The defendant, Joseph Silva, was charged by indictment on October 20, 1982, with murder in violation of General Statutes § 53a-54a (a) and (c). A jury found the defendant guilty as charged. After his motions for a judgment of acquittal and to arrest judgment were denied, the defendant was sentenced to imprisonment for a term of not less than twenty-five years nor more than life. On appeal, the defendant contends that the trial court erred: (1) in admitting evidence showing the defendant's prior acts of misconduct; (2) in denying the defendant's motions for the production of prior written statements made by two state's witnesses; (3) in admitting evidence that the defendant had purchased bullets similar to those

removed from the murder victim; and (4) in its supplemental instructions to the jury.[1] We find no reversible error.

On the evening of January 10, 1981, at approximately 9:45 p.m., Jeffrey Glass was shot to death outside his apartment in Glastonbury. A search of the crime scene uncovered two spent CCI .22 caliber shell casings. No weapon was found. The medical examiner, Stephen Adams, testified that the cause of death was .22 caliber bullet wounds to the victim's chest. A canvass of local ammunition dealers revealed that the defendant had recently purchased a box of CCI .22 caliber bullets from a nearby department store on December 18, 1980. It was also discovered that the victim and his wife, Joanne, had recently separated, and that Joanne and the defendant, who had known each other since childhood, had renewed their acquaintance. The defendant had been released from prison in November, 1980, and was on parole when he bought the .22 caliber bullets. The police executed a warrant to search the defendant's apartment on January 19, 1981. The defendant was present during the search. When questioned about the bullets, the defendant informed the officers that he had discarded them in a storm drain approximately 200 yards from his apartment. With the defendant's assistance, the police recovered the box of bullets from the storm drain, and found several bullets missing. The purchase of the bullets was a violation of the defendant's parole, and he was returned to prison.

While the defendant remained incarcerated for violation of parole, the police continued their investigation of the Glass homicide. In September, 1981, the

---

[1] The defendant also briefed the claim that this prosecution should have been dismissed on the ground that the warrant for his arrest was not supported by oath or affirmation. At oral argument the defendant withdrew this claim in light of our recent decision in State v. Fleming, 198 Conn. 255, 502 A.2d 886 (1986).

state offered a $20,000 reward for information leading to the conviction of Glass' murderer. A local television station added $5000 more. Thereafter, in May, 1982, Edward Vitale, then an inmate at the state correctional center in Litchfield, contacted the Glastonbury police and claimed that the defendant had confessed the crime to him while both were imprisoned at Somers. The defendant, still in prison, was arrested three months later, on August 4, 1982. One month later a second inmate, Allen Pilotte, informed police that the defendant had confessed to him as well. Both Vitale and Pilotte testified before the grand jury, which indicted the defendant for the murder of Jeffrey Glass on October 20, 1982.

At the defendant's trial, Vitale and Pilotte testified for the state. Vitale stated that he and the defendant first met in Somers prison in June or July of 1979, while the defendant was serving time for an earlier conviction. The defendant had been released on parole in November, 1980. Soon after his release the defendant renewed his acquaintance with Joanne Glass, who at the time was estranged from her husband. According to Vitale, the defendant stated that Joanne had wanted her husband dead. The defendant claimed to be in love with Joanne, and stated that the two of them had devised a plot to murder Glass. The plot allegedly consisted of Joanne's luring the victim to her apartment where the defendant would be waiting. The defendant would murder Glass, and Joanne and the defendant would then arrange the apartment to make it appear that the murder had been committed by a burglar.

Vitale further testified that the defendant had told him that on the evening of January 11, 1980, Joanne called her husband and asked him to meet her at her apartment. The defendant waited inside Joanne's apartment while Joanne drank at a nearby bar. When Glass failed to show up at the apartment, the defend-

ant became upset and telephoned Joanne, telling her that "he wanted to get it done tonight." Joanne agreed, and drove to her apartment where she picked up the defendant. They then drove to the victim's apartment and waited outside. Soon the victim exited his apartment and began walking toward his truck. The defendant ran up to the victim, shot him several times with a .22 caliber semi-automatic rifle, and the victim collapsed in the parking lot. According to Vitale, the defendant stated that he ran home, burying the gun in the woods somewhere along the way.

Pilotte's testimony was substantially identical to that of Vitale. It is important to note only that Pilotte allegedly heard the defendant's narration of the crime on "twenty different occasions" between March and June, 1981, when he and the defendant had been "cell partners" at the Hartford correctional center, awaiting transfer to Somers. Vitale, on the other hand, claimed to have heard the defendant's confession on numerous occasions between September and November, 1981, at Somers prison. Both Vitale and Pilotte testified on direct examination, and again on cross, that they had known about the reward before they contacted the police. They also admitted that the principal motive for their testimony was the expectation of leniency from the state with regard to their then pending criminal charges, and at the parole board.

We turn first to the defendant's twofold claim that the trial court erred in admitting evidence of his prior acts of misconduct. The trial court, over the defendant's objection, allowed a police officer to testify that he had arrested the defendant in 1973. The officer never testified as to the crime for which the defendant had been arrested. The trial court also allowed Vitale and Pilotte, in the course of their testimony, to relate that the defendant had been returned to prison for violation of parole resulting from his purchase of

the box of bullets in December, 1980. The defendant claims that the evidence of his prior arrest, and of the fact that he was on parole when he allegedly murdered Glass, was irrelevant to the issues in the case and unnecessarily prejudiced the jury against him. We disagree.

The defendant had been arrested for violation of parole in February, 1981, shortly after he had committed Glass' murder. He was first incarcerated in the Hartford correctional center where he had related the details of the crime to Pilotte between March and June, 1981. He was later transferred to Somers where he confessed to Vitale between September and November, 1981. Thus, the jury knew that the defendant had been incarcerated since early in 1981. They also knew, however, that he had not been arrested for Glass' murder until August 4, 1982. The trial court thus allowed the evidence of the defendant's prior arrest and parole violation in order that the jury would have some understanding of how the defendant had come to meet Vitale and Pilotte, both of whom had been inmates in the state correctional system. Without this evidence, the testimony of Vitale and Pilotte could have been seriously undermined. The jury was not required to speculate as to why the defendant was incarcerated more than eighteen months before he finally was arrested for Glass' murder. The trial court did not err in allowing the testimony of the defendant's prior arrest and parole status.

The defendant also claims that the trial court erred in allowing police officers to testify that they recovered marihuana cigarettes and other contraband during the January 19, 1981 search of the defendant's apartment. After discovering the contraband, the police gave the defendant his *Miranda* warnings and began to question him as to the whereabouts of the box of bullets. The defendant eventually told the police that

he had discarded the box of bullets in a storm drain, and later assisted the police in its recovery. The trial court apparently admitted the testimony that contraband had been found during the search to explain why the defendant had been given *Miranda* warnings, which in turn would support an inference that the defendant's statements concerning the bullets had been given voluntarily.

We cannot subscribe to the trial court's rationale, and conclude that it abused its discretion in allowing into evidence the testimony that contraband had been found during the search of the defendant's apartment. The defendant did not contest at trial the voluntariness or admissibility of his statements given to police during the search of his apartment. The trial court is required to balance the probative value against the prejudicial effect of evidence tending to show the defendant's commission of other crimes, and to exclude the evidence unless the former outweighs the latter. *State* v. *Reddick,* 197 Conn. 115, 129, 496 A.2d 466 (1985), cert. denied, 474 U.S. 1067, 106 S. Ct. 822, 88 L. Ed. 2d 795 (1986); *State* v. *Johnson,* 190 Conn. 541, 548, 461 A.2d 981 (1983); *State* v. *Ibraimov,* 187 Conn. 348, 352, 446 A.2d 382 (1982); *State* v. *Falby,* 187 Conn. 6, 23, 444 A.2d 213 (1982). We can find little, if any, probative value in the testimony that contraband was found during the search of the defendant's apartment.

Although the trial court erred in admitting the contraband evidence, we think the error was harmless under the circumstances of this case. The jury heard from two separate witnesses how the defendant had plotted to kill Glass, and how the crime had actually been committed. The defendant bears the burden of proving harmful error, since the erroneous introduction of prior misconduct evidence involves a claim arising under state law and does not involve any constitutional right. *State* v. *Talton,* 197 Conn. 280,

289–90, 497 A.2d 35 (1985); *State* v. *Conroy,* 194 Conn. 623, 626–27, 484 A.2d 448 (1984); see *State* v. *Ruth,* 181 Conn. 187, 196–97, 435 A.2d 3 (1980). In light of the defendant's confession as communicated to the jury by Vitale and Pilotte, we find it highly unlikely that the evidence that the defendant possessed contraband contributed significantly to the jury's verdict. *State* v. *Bruno,* 197 Conn. 326, 335–36, 497 A.2d 758 (1985), cert. denied, 475 U.S. 1119, 106 S. Ct. 1635, 90 L. Ed. 2d 181 (1986); *State* v. *Talton,* supra, 292.

We next address the defendant's claim that the trial court erred in denying his motions for production and examination of prior written statements made by two of the state's witnesses. On direct examination Commander Paul Gibbons of the Glastonbury police department testified that, in a March 3, 1981 telephone conversation about the case, the defendant had told him that "he didn't want to be known as a stool pigeon . . . something along that line." Gibbons testified that he had made rough field notes of the phone conversation that were later compiled into a formal written report. Upon request the defendant was given a copy of the formal report, but Gibbons was unable to find his rough field notes. The defendant now argues that his conviction should be reversed because the trial court failed to administer the "appropriate sanctions" for the failure of Gibbons to produce his notes. We do not agree.

The appropriate sanctions for the state's failure to comply with discovery are set forth in Practice Book § 755. That section requires the trial court either to strike the testimony of the state's witness or "upon motion of the defendant" to declare a mistrial if "the interests of justice require." In this case the trial court ordered Gibbons to search for his notes and bring them to court if he could find them. When Gibbons reported that he had looked for but could not find his notes, the defendant did not move for a mistrial nor did he ask

that Gibbons' direct testimony be stricken. Rather, defense counsel stated that "It's not that I am interested in striking his testimony. I am interested in . . . finding his notes." As the notes could not be found, defense counsel "propose[d]" that he "be allowed to inquire in the presence of the jury . . . as to whether or not [Gibbons] did, in fact, conduct an investigation seeking the notes and what he found or didn't find, and so forth." When the trial court agreed, defense counsel stated that he would "[l]et it go at that."

By choosing to "[l]et it go at that," the defendant "effectively waived, for purposes of appeal, any claim of error based on the state's . . . [non]disclosure" of Gibbons' notes. State v. Miner, 197 Conn. 298, 306, 497 A.2d 382 (1985). The defendant did not move for a mistrial or that Gibbons' testimony be stricken, but rather, received from the trial court precisely what he had requested. As a consequence, there is nothing for this court to rule upon, and the defendant's claim cannot be reviewed.

The defendant also claims error in the trial court's refusal to order production of a written "statement" that Pilotte had made to his attorney concerning the Glass homicide. After Pilotte had concluded his direct testimony for the state, the state assured the defendant that it had provided him with Pilotte's only written statement made to the Glastonbury police. The defendant then announced that he had subpoenaed Pilotte's attorney, William Collins, requesting him to produce a second statement given by Pilotte. Collins testified that he had met with Pilotte and discussed what Pilotte knew about the Glass homicide. Collins stated that he had tape-recorded the discussion, and then turned the tape over to his secretary, who compiled a five page summary of the recording. According to Collins, his secretary had not transcribed the tape

verbatim, but rather, "she just picked and chose in the . . . recording what she thought was important for me." The tape was then erased.

At trial the defendant sought production of the five page summary of the tape recording. Collins refused to turn over the summary, asserting on behalf of Pilotte the attorney-client privilege. The state then moved to quash the subpoena on the ground that the requested document was privileged, and the trial court granted the state's motion. The trial court also refused defense counsel's request that the summary be marked as an exhibit for identification. Although the trial court clearly recognized that it must mark any item *offered by counsel* as an exhibit for identification, it reasoned that if it quashed the subpoena there would be nothing for counsel to offer. The trial court also noted that "the rule that anything must be marked for identification could not be used in lieu of or as a substitute for a motion for production."

We can agree with the trial court that if a motion to quash a subpoena duces tecum is properly granted, then there is no real *need* to have marked the item sought as an exhibit for identification. This is because the granting of the motion, if proper, conclusively establishes that the evidence sought is not discoverable and, a fortiori, not admissible at trial. The difficulty with the trial court's reasoning arises from the possibility that the motion to quash was *improperly* granted. In that case the reviewing court is precluded from considering the probable effect of the evidence had it been admitted at trial. Thus, the general rule has evolved that the trial court *must* mark as an exhibit for identification *anything* offered by counsel. *State* v. *Onofrio,* 179 Conn. 23, 34, 425 A.2d 560 (1979); *Drazen Lumber Co.* v. *Casner,* 156 Conn. 401, 405–406, 242 A.2d 754 (1968); *Duncan* v. *McTiernan,* 151 Conn. 469, 470, 199 A.2d 332 (1964). In the present case, however, we

need not decide whether the trial court erred in refusing to mark the summary as a sealed exhibit for identification, because under the circumstances we find that it properly granted the state's motion to quash the subpoena duces tecum.

In *State* v. *Cascone,* 195 Conn. 183, 487 A.2d 186 (1985), we recently considered the circumstances under which the attorney-client privilege must yield to the defendant's need to confront the witnesses against him. In that case the defendant's alleged accomplice was the principal witness for the state. The defendant sought to elicit testimony from an attorney, who initially had represented jointly both the defendant and the witness, that the witness had told the attorney that the defendant had not committed the crime. Id., 186. The trial court disallowed the testimony, sustaining the accomplice's invocation of the attorney-client privilege. In reversing the defendant's conviction, we set forth a balancing test under which the "trial court should honor the privilege if and only if '[t]he *injury* that would inure to the [attorney-client] relation by the disclosure of the communicatio[n] [is] *greater than the benefit* thereby gained for the correct disposal of litigation.' (Emphasis in original.) 8 Wigmore, [Evidence] § 2285 (4), p. 527." *State* v. *Cascone,* supra, 189.

The defendant on appeal relies on *State* v. *Cascone* for his claim that his need for the summary of Pilotte's statement to his attorney outweighed any injury that disclosure might have caused the attorney-client relationship. We would first note that our holding in *Cascone* assumes the existence of a valid attorney-client relationship essential to support an invocation of the privilege. Only then is it necessary to balance the "competing interests of confidentiality and access to evidence." Id. At no time during the trial of this case did the defendant contend that his need for the summarized statement outweighed the injury that might befall

the attorney-client relationship by failure to honor the privilege. Instead, the defendant consistently maintained that Pilotte had impliedly *waived* the privilege by testifying to matters which he had previously discussed with his attorney. As argued by defense counsel, "I think he certainly waived [the privilege] when he testified here this morning as to the direct subject matter which is also the direct subject matter of the memorandum in [Attorney] Collins' file. Certainly he waived it. Once he takes the stand and testifies as to that very substantive matter, he's waived anything with regard to that statement." According to counsel, the substance of Pilotte's prior meeting with his attorney was no longer confidential to the extent that he had revealed similar matter in his testimony at trial. Therefore, counsel contended that the trial court should read the summarized statement to determine whether it concerned the details of the defendant's alleged confession to Pilotte. Counsel argued that the summarized statement could not be considered confidential for purposes of the attorney-client privilege to the extent that it coincided, to some unspecified degree, with Pilotte's testimony at trial.

The trial court was thus not asked to balance the competing interests of confidentiality and access to information. Rather, the trial court devoted substantial time to the defendant's suggestion that the attorney-client privilege is waived merely because the client openly describes a series of events which he previously has related in confidence to his attorney. It is important in this case to note that Pilotte did not refuse to divulge what the defendant allegedly had told him about the Glass homicide. Pilotte claimed the privilege only with respect to his previous discussions with his attorney. As aptly stated in colloquy by the trial court: "The point remains that what you are seeking is a summary of a conference between an attorney and his client in which

the client sought legal advice. Now, that client has testified about a lot of things here today, but he has not testified about this conference with his attorney, so that the Court is not willing to infer that he has waived the attorney-client privilege. He's testified as to what your client told him about the Jeffrey Glass murder. He has not testified concerning his conference with his attorney.''

Thus, although the issue at trial is somewhat dissimilar to that now raised by the defendant on appeal, we would note in passing that even under *Cascone* the defendant would not have been entitled to production of Pilotte's summarized statement to his attorney. The defendant in *Cascone* offered evidence that the principal witness against him had previously stated that the defendant had not committed the crime, and we determined that the jury was entitled to consider such information during its deliberations. The defendant Cascone had thus clearly made a substantial threshold showing of need for the privileged information. In the present case, however, the defendant had no idea of what would be found in Pilotte's summarized statement to his attorney. The defendant could only surmise that some inconsistency or other beneficial disclosure might come to light. We do not believe that mere curiosity should be enough to overcome the attorney-client privilege.[2]

Finally, the record reflects that the defendant had adequate opportunity to test the credibility of Pilotte's

[2] With regard to the statutory psychiatrist-patient privilege; General Statutes § 52-146e; we have recently held that the trial court must conduct an in camera proceeding "[w]here there is any reasonable basis in the evidence for believing that psychiatric personnel may have information relating to the mental condition of a witness that might affect his testimony." *State v. Pierson*, 201 Conn. 211, 228, 514 A.2d 724 (1986). Implicit in *Pierson* was the recognition that without such a proceeding it is simply not possible for the defendant to discover testimonial incapacities arising from the witness' unstable mental condition. In the present case the sources of

testimony. Counsel had possession of Pilotte's prior statement given to the Glastonbury police, as well as a transcript of his testimony before the grand jury. Counsel apparently was unable to detect any significant inconsistencies between Pilotte's prior statements and his testimony at trial. Pilotte was cross-examined extensively as to his twelve prior felony convictions, as to his expectation of leniency from the state with respect to his pending criminal charges, and as to his desire for a reduction in his appeal bond. Pilotte admitted that his situation had been "desperate" when he contacted the Glastonbury police seeking to make a deal. Pilotte also conceded that he had raised the defense of alcohol dependency in all of his cases over the past ten years, and that his addiction to alcohol had most likely affected his memory. Reviewing the entire course of cross-examination; *State* v. *Edwards,* 201 Conn. 125, 142–43, 513 A.2d 669 (1986); we do not believe that the search for truth was critically impaired by the trial court's refusal to order production of Pilotte's summarized statement made to his attorney. The trial court did not err in granting the state's motion to quash the subpoena duces tecum.

We next turn to the defendant's claim that the trial court erroneously allowed into evidence testimony that the defendant had purchased a box of .22 caliber bullets in December, 1980. The defendant's essential argument in this regard is that the bullets which he had purchased "simply could not be linked to the projectile that killed

---

Pilotte's potential to falsify his testimony—the reward, his desire for leniency—were fully exposed to the jury. Furthermore, *Pierson* does not authorize a generalized in camera search through psychiatric records for prior inconsistent statements allegedly made by the witness. Rather, the trial court must merely determine whether the psychiatric personnel are aware of any *mental condition* of the witness that would be admissible to impeach his or her credibility. We do not believe that our holding in *Pierson* can reasonably support the defendant's claim for an in camera proceeding in this case.

the decedent.'' The defendant concludes that the prejudicial effect of the testimony that he purchased the bullets outweighed its probative value, and that he is thereby entitled to a new trial. We do not agree.

The fact that the defendant had purchased the box of bullets was admissible into evidence for several reasons. First, the defendant's purchase of the bullets was a violation of his parole, resulting in his return to prison where he would eventually tell his story to Vitale and Pilotte. As previously discussed, the jury was entitled to know how the defendant had become associated with these prison inmates long before his arrest for this murder. Second, the state presented ballistics testimony that the slugs removed from Glass' body, and the shell casings found at the scene of the crime, were of the same make and type as the .22 caliber bullets purchased by the defendant. The murder weapon was never recovered, so the ballistics expert could not determine whether the slugs had been fired from any particular gun; nor could the expert render an opinion as to whether the slugs and casings found at the crime scene had come from the box of bullets purchased by the defendant. Yet, the state was not required to prove to an absolute certainty that the bullets recovered from the victim's body came from the box purchased by the defendant. *State* v. *Morrill,* 197 Conn. 507, 548–49, 498 A.2d 76 (1985). The jury could reasonably have drawn significance from the state's evidence that the bullets were of the same make and type, that the defendant had purchased them less than one month before Glass' murder, that the defendant had discarded the bullets in a storm drain, and that a number of bullets were found missing from the box.

The defendant in his brief relies on our cases in which we have found reversible error in the trial court's admission of prejudicial evidence tending to show the commission of other crimes where that evidence was

unrelated to the crime charged. *State* v. *Onófrio,* 179 Conn. 23, 31, 425 A.2d 560 (1979); *State* v. *Acklin,* 171 Conn. 105, 114–15, 368 A.2d 212 (1976); *State* v. *Ferraro,* 160 Conn. 42, 45, 273 A.2d 694 (1970); *State* v. *Johnson,* 160 Conn. 28, 31, 273 A.2d 702 (1970); see *State* v. *Wilson,* 199 Conn. 417, 449–50, 507 A.2d 1367 (1986). In the present case, however, the state offered sufficient evidence to connect the bullets purchased by the defendant with those recovered from Glass' body. In addition to the facts cited above, Vitale offered the following significant testimony:

"State's Attorney: Now, with specific reference to the discussion of the bullets, did Mr. Silva ever express any concern to you about that particular area?

"Vitale: He was very upset with himself about purchasing the bullets.

\* \* \*

"State's Attorney: Did Mr. Silva ever relate to you what he did with the bullets, those particular bullets?

"Vitale: Aside from the ones he used in the gun?

"State's Attorney: Yes.

"Defense Counsel: Besides what?

"Vitale: Aside from the ones he used in the gun. Yes, he did. He told me that he had put them in a sewer."

We think the clear implication of this testimony is that the defendant used some of the bullets he purchased in December, 1980, in the gun with which he shot the victim. The trial court did not err in admitting evidence relating to the defendant's purchase of the bullets.

The defendant's final claim of error concerns the trial court's responses to two questions submitted by the jury during its deliberations. On the fourth day of

deliberations, the jury requested a reading of a portion of the testimony of Terry Kitchen, the defendant's principal alibi witness, as well as a response to the question: "Did Joanne Glass testify as to first contact with Joseph Silva after Jeffrey Glass' homicide?" Kitchen had testified that the defendant informed him of the Glass homicide on January 11, 1981, one day after it had occurred. The defendant suggests that the jury wanted to determine whether Joanne Glass might have told the defendant about the homicide, or alternatively, whether the defendant knew about the crime so soon after it had been committed due to his own complicity in it.

The trial court ordered the testimony of Kitchen read back to the jury. Both counsel explicitly agreed that the trial court should answer the jury's question by stating: "The record does indicate when Joanne Glass first saw Joseph Silva after the homicide. If you wish further information concerning the matter, you may form a specific question and submit it to the court." The trial court then responded to the jury as agreed. Within twenty-five minutes the jury submitted a second question: "Please read us testimony of Joanne Glass as to her first contact with Joseph Silva following Jeffrey Glass' homicide." The court reporter then located the testimony requested by the jury. In order to place that testimony in context, we begin several lines ahead:

"State's Attorney: How would you characterize your relationship to Mr. Silva prior to your marriage to Jeffrey Glass?

"Joanne: We were friends.

"State's Attorney: Had you ever lived together or anything of that nature?

"Joanne: No, never.

"State's Attorney: Had you ever dated?

"Joanne: No.

"State's Attorney: I take it [that] it was the same type of relationship after you were married to Mr. Glass, same relationship with Mr. Silva?

"Joanne: Correct.

"State's Attorney: You hadn't seen him at any time during the period . . . that you were married to Mr. Glass that you can recall?

"Joanne: Not that I can recall. I may have, but I just don't recall it.

"State's Attorney: When next did you *see* Mr. Silva after the day that your husband was killed? [Emphasis added.]

"Joanne: A few days later.

"State's Attorney: Under what circumstances?

"Joanne: My brother had walked my dog and I guess he saw him and invited him over to my mother's house.

\* \* \*

"State's Attorney: You saw Mr. Silva at that time and what did you discuss, if anything?

"Joanne: Probably how upset I was at the time, what had unfortunately happened.

"State's Attorney: That was the extent of your conversation?

"Joanne: Well, there were other people present at the conversation, so he didn't only speak to me.

"State's Attorney: How long were you in the presence of Mr. Silva on this particular occasion?

"Joanne: Probably about an hour.

"State's Attorney: When next did you see Mr. Silva?

"Joanne: A few weeks later."

The trial court proposed that the above testimony be read to the jury. Before doing so it asked for comments from counsel. Defense counsel made the following statement: "Well, for the record, your Honor, I suppose I should just state that—as I did in chambers, that the question as it is phrased refers to first contact. The transcript, it's true, refers to when she saw him next. I don't know that the reading of this transcript is responsive to the question that the jury has asked, so to that extent I just wish to take an exception." The trial court then ordered the relevant portion of Joanne Glass' testimony read back to the jury.

The defendant claims on appeal that Joanne's testimony should not have been read back to the jury. While that testimony indicates that Joanne had not *seen* the defendant until several days after the murder, the defendant argues that the jury's question referred more broadly to *contact* of any kind, including, e.g., telephone contact. Thus, the defendant contends that Joanne Glass had not testified as to her first *contact* with the defendant after her husband's murder, and that the answer to the jury's first question should have been "no," instead of the affirmative answer as stipulated by both counsel at trial. The defendant claims to have been prejudiced by the trial court's reading back the testimony of Joanne Glass because the jury purportedly was left with the impression that the defendant's first contact with Joanne was not until several days after the homicide, and that the defendant could only have known about the homicide on the following day because he had in fact committed it.

We find no merit in the defendant's claim. The portion of Joanne Glass' testimony read to the jury would suggest that she had not had significant contact of any kind with the defendant until several weeks after the murder. The testimony was read verbatim, and there-

fore, the jury heard her testify that she had not *seen* the defendant until several days later—not that she had had no *contact* with him. The jury was entitled to draw its own conclusion as to whether there had been any telephone conversation between them. Finally, Kitchen, the defendant's alibi witness, testified that he had not seen the defendant on January 11, 1981, until approximately 4 p.m. By that time the defendant could have learned about Glass' murder on the night before from any number of sources. In sum, we do not think it reasonably possible that the jury could have been misled by the trial court's reading of the challenged portion of Joanne Glass' testimony.

There is no error.

In this opinion the other justices concurred.