STATE OF CONNECTICUT *v.* SHOWKAT ALI
(15023)

PETERS, C. J., and CALLAHAN, BORDEN, KATZ and PALMER, Js.

Argued March 16—decision released June 6, 1995

*Jeremiah Donovan*, for the appellant (defendant).

*John P. Gravalec-Pannone*, assistant state's attorney, with whom, on the brief, was *Kevin T. Kane*, state's attorney, for the appellee (state).

KATZ, J. The dispositive issue on appeal is whether the trial court's instructions on constancy of accusation improperly failed to inform the jury that it could use the victim's out-of-court statements to impeach her credibility. Because the trial court neglected to instruct the jury that it could consider any contradictions, inconsistencies or falsities in her statements in assessing her credibility, despite four separate requests to so charge, the court's instructions failed to guide the jury properly in resolving the contested issues before it. We conclude that, because this case turned almost exclusively on the credibility of the victim and the defendant, her former husband, this omission constituted harmful error.

The state presented evidence tending to establish the following facts. The victim and the defendant, Showkat Ali, had been married from 1982 to 1988. The couple had two children, both of whom lived with the victim at her home in New London, after the couple divorced in 1988. They had no set visitation schedule, and visitation was at the victim's discretion. On July 9, 1991, the children had been staying with the defendant at his home in New York for approximately ten days and were due to return to their mother that night. When the defendant had called his former wife to say that he would not be returning the children that night as agreed, she immediately drove the two hours to his home at 129 Overlook Drive, Mount Vernon, New York, with the hope of recovering the children.

After the victim arrived, she and the defendant argued through his closed door for several minutes. When the defendant finally opened the door, she saw that he was holding a machete in his hand. Perceiving this as a threat, the victim ran down the driveway to the street and was followed by the defendant. After he told her to leave, she asked a neighbor to call the police. When the police arrived, they saw the machete

on the defendant's kitchen table, but they did not seize it. The police then told the defendant to produce the children. After he had done so, the victim took the children back to New London and advised the police that she did not wish to press charges.

Julie Corigliano and her sister Autumn Corcione, while sitting on the front steps of their home at 118 Overlook Street in Mount Vernon, during the evening of July 9, 1991, saw the victim run across the street toward them. She was upset and hysterical. The defendant remained in the driveway and screamed at the victim in a foreign language. Using a portable cellular telephone that belonged to Corcione, the victim called the police. During the fifteen minutes before the police arrived, the defendant paced up and down the driveway while the victim kept her distance. The police entered the house and brought the children outside. After the victim had driven off with the children, the defendant came out of the house. The defendant then got into his car, which was parked in front of the sisters' house and directly under a street light. Because of the reflection from the street light, the sisters were able to see that he was carrying a knife. Corcione estimated that they were fifteen feet away from the defendant when they saw the weapon. According to Corigliano, the knife had a silver blade and looked more like a machete than a knife.

That same evening, moments after the victim had arrived at her New London home and carried one sleeping child upstairs, the defendant appeared in her kitchen. The victim screamed and tried to run, but the defendant caught her and held a twelve inch knife to her throat. The defendant threatened that if she continued to scream he would kill her. He allowed her to retrieve their other child from the car to be put to bed, but threatened to kill the child already in the house if she attempted to run away. He then ordered her to

remove her clothing and beg for her life. While he continued to hold a second knife in his hand, he then ordered her to perform fellatio. This act lasted a few minutes. He then had vaginal intercourse with the victim. Following ejaculation, he threatened that if she reported the incident to the police he would return and kill her and their children. Each time she went near the front door, the defendant turned to the staircase leading toward the upstairs where the children were sleeping. When he left, he took the two knives as well as a hammer the victim had also seen in his possession. The entire episode transpired between 12:30 a.m. and 5:30 a.m.

After the defendant had left, the victim showered, took the children to their baby-sitter and went to work. She was visibly upset and uncharacteristically withdrawn. At the urging of her coworker, Linda Kahn, and her supervisor, Cheryl Foley, she told them what the defendant had done to her. They convinced her to go to the police.

At New London police headquarters, which was only a few blocks from her home, the victim spoke with officer Douglas Williams, who then prepared an arrest warrant. Two years later, in August, 1993, the police located the victim, and officer Phillip Fazzino took a statement from her in which she stated that she had been abused for five or six hours and that she had been forced to have oral sex and vaginal sex at least two times.

Although the defendant did not see the children after this incident, the victim identified a number of child support and gift checks as well as certified mail return receipt requested slips for presents that the defendant had sent to the children after the incident. She confirmed that her marriage to the defendant had been marked by frequent separations and reconciliations.

She further confirmed that they were having consensual sexual intercourse even after their divorce, but denied that such relations had continued beyond the spring of 1990.

The defendant denied using force or the threat of force against the victim on the night in question. He testified that after she had left his home in New York, he followed her to New London. He admitted that he had surprised her by appearing in her apartment and that, when she began to scream, he had placed his hand over her mouth to stop her screaming, but he denied that he had carried any weapons or that he ever had threatened to harm her or the children. He further testified that he had been embarrassed that she had called the police in Mount Vernon. He then described an evening that consisted of conversation regarding their children and consensual sexual relations. The defendant testified that it had not been uncommon for them to fight and then to have sexual relations as part of the reconciliation process. He further testified that before he left, they had engaged in further conversation, followed by additional fighting about the victim's then current boyfriend.

The defendant ultimately was arrested on August 23, 1993, and charged by substitute information with kidnapping in the first degree in violation of General Statutes (Rev. to 1991) § 53a-92 (a) (2) (A),[1] two counts of sexual assault in the first degree in violation of General

[1] General Statutes (Rev. to 1991) § 53a-92 provides in relevant part: "KID-NAPPING IN THE FIRST DEGREE: CLASS A FELONY. (a) A person is guilty of kidnapping in the first degree when he abducts another person and when: (1) His intent is to compel a third person to pay or deliver money or property as ransom, or to engage in other particular conduct or to refrain from engaging in particular conduct; or (2) he restrains the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually; or (B) accomplish or advance the commission of a felony; or (C) terrorize him or a third person; or (D) interfere with the performance of a government function."

Statutes § 53a-70 (a) (1),[2] and one count of threatening in violation of General Statutes § 53a-62 (a) (1).[3] Following the judgment of conviction on all four counts, the defendant appealed to the Appellate Court and we transferred the case to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). Additional facts will be set forth as needed.

I

The defendant first claims that the trial court improperly failed to instruct the jury as to his affirmative defense that the prosecution to the charge of threatening was commenced beyond the statute of limitations as set forth in General Statutes § 54-193 (b).[4] We agree.

The following facts are relevant to this claim. Inspector John Edwards of the New London police department testified that, on July 10, 1991, the first warrant for the defendant's arrest, on the basis of the events of July 9, 1991, was prepared by a patrol officer, and

---

[2] General Statutes § 53a-70 provides in relevant part: "SEXUAL ASSAULT IN THE FIRST DEGREE: CLASS B FELONY: ONE YEAR NOT SUSPENDABLE. (a) A person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person . . . ."

[3] General Statutes § 53a-62 provides in relevant part: "THREATENING: CLASS A MISDEMEANOR. (a) A person is guilty of threatening when: (1) By physical threat, he intentionally places or attempts to place another person in fear of imminent serious physical injury . . . ."

[4] General Statutes § 54-193 provides in relevant part: "LIMITATION OF PROSECUTIONS FOR VARIOUS OFFENSES. . . .

"(b) No person may be prosecuted for any offense, except a capital felony, a class A felony or a violation of section 53a-54d, for which the punishment is or may be imprisonment in excess of one year, except within five years next after the offense has been committed. No person may be prosecuted for any other offense, except a capital felony, a class A felony or a violation of section 53a-54d, except within one year next after the offense has been committed."

that on July 19, 1991, that warrant was signed by an assistant state's attorney and issued by a judge of the Superior Court. The warrant stated that the incident occurred at the victim's home at 163 Huntington Street, New London, and that the defendant lived at 129 Overlook Drive, Mount Vernon, New York. Following its issuance, in November, 1991, the New London police listed the warrant with the National Crime Information Center. Sometime in 1991, the victim called the New London police department and learned that, although a warrant had been issued for the defendant's arrest, that department did not have "enough money to go down there [to New York] to arrest him."

On July 5, 1993, the defendant was arrested in Watertown, New York. The Watertown authorities notified the New London police that they had the defendant in custody and that he was willing to waive extradition to Connecticut. After receiving this information from Mount Vernon, Edwards asked the captain of his department to locate the victim. Because the department did not then know the victim's whereabouts, Edwards concluded that the warrant of July 19, 1991, should be vacated. He also expressed concern that his department had failed to get a statement from the victim when she had first reported the incident. Additionally, because the warrant application identified the victim by name, Edwards believed it was in violation of General Statutes (Rev. to 1991) § 54-86e.[5] Consequently, Edwards notified the Mount Vernon

---

[5] General Statutes (Rev. to 1991) § 54-86e provides: "Information re name and address of victim of sexual assault to be confidential. The name and address of the victim of a sexual assault under section 53a-70, 53a-70a, 53a-71, 53a-72a, 53a-72b or 53a-73a, or injury or risk of injury, or impairing of morals under section 53-21, or of an attempt thereof shall be confidential and shall be disclosed only upon order of the superior court, except that such information shall be available to the accused."

authorities that extradition would not be authorized and requested that they release the defendant.

On August 18, 1993, after the victim had been located, a second arrest warrant affidavit and application were submitted to Judge Robert Leuba of the Superior Court, who signed the warrant on August 19, 1993. The warrant noted that the defendant "still resides at 129 Overlook Dr., Mt. Vernon, New York." The defendant was arrested on the basis of this second warrant on August 23, 1993, and he waived extradition on August 27, 1993.

Following his arraignment on September 2, 1993, the defendant filed a motion to dismiss the fourth count of the information charging him with threatening because his prosecution was time barred by § 54-193 (b).[6] The trial court, *Parker, J.*, deferred its ruling on that motion until the conclusion of the trial. After the state had rested, the defendant moved for judgment of acquittal based upon the statute of limitations. No action was taken on that motion. Following the close of the evidence, the defendant filed a request to charge asking that the jury be allowed to consider the affirmative defense that his prosecution on the threatening count was barred by § 54-193 (b). The trial court denied the request, and determined that the issue was a question of law to be considered after the verdict was returned. At the sentencing hearing, the trial court denied the defendant's renewed motion to dismiss.

---

[6] The defendant also argued that he had been prejudiced as a result of the delay in his arrest because witnesses from the victim's neighborhood were no longer available. This argument was comparable to a claim that his due process rights had been violated, which required that he show both that actual substantial prejudice resulted from the delay and that the reasons for the delay were wholly unjustified. See *United States* v. *Lovasco*, 431 U.S. 783, 97 S. Ct. 2044, 52 L. Ed. 2d 752 (1977). That issue was not pursued on appeal and is therefore not properly before us.

On appeal, the defendant argues that under the facts and circumstances of this case, whether the defendant had been "prosecuted" within the applicable period of time as required by § 54-193 (b) is an affirmative defense on which the trial court improperly failed to instruct the jury. In response, the state first argues that the issuance of the initial warrant satisfied the statute of limitations because it qualified as a "prosecution" within the meaning of § 54-193 (b).[7] The state also argues that, by leaving the jurisdiction immediately after the July 9, 1991 incident, the defendant intended to evade the authorities and, therefore, that the statute of limitations was satisfied. We disagree with the state that the issuance of the initial warrant unequivocally satisfied the statute of limitations. Moreover, we disagree with the state that the defendant's departure from the state is dispositive of this issue. Rather, we conclude that the outcome is controlled by *State* v. *Crawford*, 202 Conn. 443, 521 A.2d 1034 (1987), wherein we held that the issuance of an arrest warrant qualifies as a "prosecution" within the meaning of § 54-193 (b) only if the state executes it without unreasonable delay and that, in determining whether the state executed the warrant without unreasonable delay, the fact finder may consider whether the defendant left the jurisdiction and was difficult to apprehend.

In *Crawford*, we stated that § 54-193 (b) "does not define 'prosecuted' or contain any provision delineat-

---

[7] The state argues that the first and second warrants were essentially the same and that the issuance of the first warrant, within one year of the offense, satisfied § 54-193 (b). We agree that if the prosecution of the defendant had been instituted pursuant to the first warrant, then the issuance of that warrant would have satisfied the statute of limitations. The fact that the first warrant was later vacated and a new warrant was immediately thereafter issued and executed does not undermine that conclusion. The defendant was the same, the offenses were the same and the factual allegations were essentially the same. See *State* v. *Almeda*, 211 Conn. 441, 448, 560 A.2d 389 (1989).

ing at what stage of the prosecution the limitation period is tolled.[8] The Appellate Session of the Superior Court in *State* v. *Cordova*, [38 Conn. Sup. 377, 448 A.2d 848 (1982)], the only authority in Connecticut construing this provision, analyzed the statute in the context of the policies underlying limitations statutes, and concluded that the issuance of the warrant tolls the statute of limitations.

"Although the purpose of a statute of limitations is to ensure a timely commencement of prosecution, jurisdictions differ on what act will suffice to show such commencement. In jurisdictions where legislation requires the finding of an indictment or the filing of an information as the first step in a criminal case, the 'prosecution' is deemed commenced by either of these acts, and the running of the statute of limitations is thereby tolled. 2 W. LaFave & J. Israel, Criminal Procedure § 18.5; see 1 F. Wharton, Criminal Law (14th Ed.) § 90. In the absence of such legislation, however, it is generally held that the prosecution is commenced, and the statute tolled, at the time a complaint is laid before a magistrate and a warrant of arrest is issued. *State* v. *Chacon*, 479 So. 2d 229, 230 (Fla. App. 1985); *McMorris* v. *State*, 277 Md. 62, 67–68, 355 A.2d 438 (1975); *State* v. *Mars*, 39 Md. App. 436, 438, 386 A.2d 1234 (1978); see *Akers* v. *State*, 370 So. 2d 81, 83 (Fla. App. 1979); *State* v. *White*, 92 P. 829, 830 (Kan. 1907); 2 W. LaFave & J. Israel, supra; 21 Am. Jur. 2d, Criminal Law § 230. The American Law Institute model penal code is in

---

[8] In *State* v. *Crawford*, supra, 202 Conn. 443, we used the term "tolled," as well as other forms of the verb "toll," in connection with § 54-193 (b) merely to describe the practical effect of a delay in the execution of an arrest warrant. Of course, in light of the traditional meaning of the term "toll" within the parlance of statutes of limitations, namely as a synonym for "suspend"; see Black's Law Dictionary (6th Ed. 1990); a "prosecution" within the applicable time period satisfies, rather than "tolls," the statute of limitations. Only § 54-193 (c) specifically concerns the tolling of the statute of limitations.

accord. It provides that '[a] prosecution is commenced either when an indictment is found [or an information filed] or when a warrant or other process is issued, provided that such warrant or process is executed without unreasonable delay.' Model Penal Code (1985) § 1.06 (5); see *State* v. *Barnes*, 66 Or. App. 896, 676 P.2d 344 (1984); *Commonwealth* v. *Patterson*, 236 Pa. Super. 131, 344 A.2d 710 (1975).

"General Statutes § 54-193 (b) does not make reference to the finding of an indictment or the filing of an information but provides only that a person must be 'prosecuted' within a specified time. Further, neither the Practice Book nor our statutes contain provisions for the finding of an indictment or the filing of an information prior to the arrest of an accused person. Cf. Practice Book § 972. In this state, the initial step to commence a prosecution, when an arrest is to be made by virtue of a warrant, is the presentation of an application for a warrant, which is accompanied by an affidavit, by a prosecutorial official to a judicial authority. If the judicial authority finds that the accompanying affidavit shows probable cause to believe that an offense has been committed, and that the person complained against committed it, the judicial authority may issue an arrest warrant. General Statutes § 54-2a.

"When an arrest warrant has been issued, and the prosecutorial official has promptly delivered it to a proper officer for service, he has done all he can under our existing law to initiate prosecution and to set in motion the machinery that will provide notice to the accused of the charges against him. When the prosecutorial authority has done everything possible within the period of limitation to evidence and effectuate an intent to prosecute, the statute of limitations is tolled. See *State* v. *Hickman*, 189 So. 2d 254, 261–62 (Fla. App. 1966). An accused should not be rewarded, absent evidence of a lack of due diligence on the part of the

officer charged with executing the warrant, for managing to avoid apprehension to a point in time beyond the period of limitation.

"We recognize, however, that some limit as to when an arrest warrant must be executed after its issuance is necessary in order to prevent the disadvantages to an accused attending stale prosecutions, a primary purpose of statutes of limitation. *United States* v. *Levine*, 658 F.2d 113, 127 (3d Cir. 1981); *State* v. *Coleman*, 202 Conn. 86, 91, 519 A.2d 1201 (1987); see *United States* v. *Marion*, 404 U.S. 307, 92 S. Ct. 455, 30 L. Ed. 2d 468 (1971). Therefore, we adopt, what we think is the sensible approach of the model penal code, and conclude that, in order to toll the statute of limitations, an arrest warrant, when issued within the time limitations of § 54-193 (b), must be executed without unreasonable delay. Model Penal Code, supra. We do not adopt a per se approach as to what period of time to execute an arrest warrant is reasonable. A reasonable period of time is a question of fact that will depend on the circumstances of each case. If the facts indicate that an accused consciously eluded the authorities, or for other reasons was difficult to apprehend, these factors will be considered in determining what time is reasonable. If, on the other hand, the accused did not relocate or take evasive action to avoid apprehension, failure to execute an arrest warrant for even a short period of time might be unreasonable and fail to toll the statute of limitations.

"The statute of limitations is, however, an affirmative defense. *State* v. *Coleman*, supra, [202 Conn.] 90; *State* v. *Littlejohn*, 199 Conn. 631, 640, 508 A.2d 1376 (1986). Consequently, the burden [is] on the defendant to prove the elements of that defense by a preponderance of the evidence. *State* v. *Coleman*, supra [90]; *State* v. *Littlejohn*, supra [640]; see General Statutes § 53a-12 (b); *United States* v. *Karlin*, 785 F.2d 90, 92

(3d Cir. 1986) [cert. denied, 480 U.S. 907, 107 S. Ct. 1351, 94 L. Ed. 2d 522 (1987)]." *State* v. *Crawford*, supra, 202 Conn. 447–51.

Therefore, the issuance of an arrest warrant is sufficient "prosecution" to satisfy the statute of limitations only if the warrant is executed with due diligence. Because the statute of limitations is an affirmative defense, the question of whether the execution of the warrant was reasonable is a question of fact for the jury. In this case, the defendant argues that, because he produced evidence on the issue of whether the first warrant was served with due diligence, he was entitled to have the jury decide whether he had sustained his burden of proof as to his affirmative defense to the threatening charge. We agree.

The New London police had the victim's address and did not treat her as unavailable until two years later when the Mount Vernon authorities first notified them that the defendant was being held. Additionally, the New London police had the defendant's address. There was no basis, therefore, upon which to conclude, nor did the New London police in fact conclude, that the defendant would be difficult to apprehend. Moreover, it is undisputed that the defendant continued to attempt to contact his children. He sent numerous checks to them, as evidenced by the certified mail return receipt requested slips. The jury could have concluded, therefore, that had the New London police department made any effort to contact the victim in the intervening two years or to involve the Mount Vernon authorities, who could have found the defendant at the address listed on the arrest warrant, the arrest could have been effectuated far sooner. Therefore, the issue of whether the state executed the warrant within a reasonable period of time was properly a question of fact for the jury. Consequently, we agree with the defendant that he was entitled to have the jury instructed on his affirmative defense.

## II

The defendant next claims that the trial court's instructions misled the jury by failing to state fully the permissible uses of the victim's prior out-of-court statements. He contends that, because the trial court admitted evidence of constancy of accusation, it was required to instruct the jury that it could use that evidence for all proper purposes, including the impeachment of the victim. We agree.

Pursuant to Practice Book §§ 853 and 854,[9] the defendant filed four timely requests to charge seeking that the court inform the jury that it could consider the victim's prior inconsistent statements to impeach her credibility.[10] As the state concedes, the court never

---

[9] Practice Book § 853 provides: "Written requests to charge the jury must be filed in triplicate with the clerk before the beginning of the arguments or at such earlier time during the trial as the court directs, and the clerk shall file them and forthwith hand one copy to the judicial authority and one to opposing counsel."

Practice Book § 854 provides: "When there are several requests, they shall be in separate and numbered paragraphs, each containing a single proposition of law clearly and concisely stated with the citation of authority upon which it is based, and the evidence to which the proposition would apply. Requests to charge should not exceed fifteen in number unless, for good cause shown, the court permits the filing of an additional number. If the request is granted, the judicial authority shall apply the proposition of law to the facts of the case.

"A principle of law should be stated in but one request and in but one way. Requests attempting to state in different forms the same principle of law as applied to a single issue are improper."

[10] The defendant's request to charge stated:

"Inconsistent Statements:

"If you find that there has been an inaccuracy in one respect upon the part of a witness, remember it in judging the rest of his testimony, and give to it that weight which your minds lead you to think it ought to have, and which you would attach to it in the ordinary affairs of life where you found one to be inaccurate. However, if you find that a witness has not only testified falsely, but done so intentionally, this fact casts a serious doubt on all his testimony, and you might well conclude that you cannot accept any of it. *State* v. *Enanno*, 96 Conn. 420, 427–28, [114 A. 386] (1921).

instructed the jury that it could use inconsistent statements for impeachment purposes. Indeed, the only time

"There has been admitted to evidence written statement of [the victim] given by her regarding the incident on July 9, 1991. These exhibits can be used by you to compare what it says and what it does not say, to the in-court testimony given by [the victim]. It is not offered to prove that what it says is true. Rather, it is offered to prove whether or not it is inconsistent with her in-court testimony. If a statement given at a prior time fails to mention an important fact testified to in court, which fact it would have been natural to mention in the prior statement, the prior written statement is sufficiently inconsistent. It is to be weighted by you to determine what facts, if any, you want to believe. *State* v. *Chesney*, 166 Conn. 630, 636, [353 A.2d 783] (1974). . . .

"Credibility of Witness:

"In determining the credibility of a witness, you should also consider that his or her testimony may be discredited or impeached by showing that the witness previously made statements that are inconsistent with his or her testimony given in court.

"As a general rule, the purpose of showing the earlier inconsistent statement of the witness is only to discredit or impeach the witness' testimony. As to such statements, your duty is solely to determine whether they do discredit or impeach the witness. However, if you do find that earlier statements are inconsistent with the witness' trial testimony, even if the trial testimony was a mere failure to recall, and the earlier statements were made under oath (and in writing) then you may also regard them as proof of what is asserted in the statements as well as for their impeaching value. It is up to you to determine whether you believe the earlier or the later testimony to be true, or whether you believe none of it.

"It is also up to you to determine what credibility, if any, you will give the testimony of a witness who has been impeached by an earlier inconsistent statement. If a witness is shown to have knowingly testified falsely, concerning any matter of importance to this case, you have a right to distrust any other portions of the witness' testimony, though you need not do so. You may reject any or all of the testimony of that witness, or give such credibility or weight as you think it deserves. *State* v. *Enanno*, [supra, 96 Conn. 427–28]. . . .

"Inconsistent Statements:

"A type of evidence that is present in this case is the introduction of inconsistent statements. In the case of a witness who is not a party to an action, that is, who is not the defendant in this case, evidence of statements made out of court, whether written or oral, inconsistent with his or her testimony on the stand, is admitted not to prove the truth of the facts contained in the statement, but as evidence of conduct inconsistent with his or her testimony on the stand. You should consider such evidence, therefore, as you would any other evidence of inconsistent conduct in determining the

that the trial court discussed the relevance of prior statements by the victim was in its constancy of accu-

weight to be given to the witness' testimony on the stand. On the other hand, if you find a reasonable explanation for such inconsistency, you may disregard the evidence of inconsistent statements. In the case of a witness who is a party in this case, the defendant, evidence of statements made by him out of court are admitted, not only as evidence of conduct inconsistent with his testimony on the stand, but also to prove the truth of the facts contained in the statement. They are to be considered by you together with all the evidence and you should give them such weight as they appear to be entitled to in view of all the circumstances under which they were made.

"For instance, you may recall that [the victim] testified during parts of her testimony she made some statements concerning events she claim[s] that transpired on July 9, 1991. You will recall that certain statements of [the victim] were admitted into evidence which were different from her in court testimony.

"The testimony of a witness may be discredited or impeached by showing that he or she previously made statements which are inconsistent with his or her present testimony. Prior statements of a witness which are inconsistent with his or her trial testimony constitute evidence and are admissible to impeach the credibility of the witness. It is the province of the jury to determine the credibility, if any, to be given the testimony of a witness who has been impeached. . . .

"Constancy of Accusation:

"Ordinarily, as you may know, statements made out of court are not admissible, because they lack the support of the oath which a witness takes in court. But to that general rule there are exceptions, and in this case we have encountered one of them. The state offered evidence of statements made by the complainant, [the victim] in the case concerning the alleged crime, and these statements were admitted in evidence. The reason for that is this: [The victim] has testified here in court as to the offense she claims was committed upon her. Now if that was all you had before you, you would naturally ask yourselves, why did she keep silent about it until she came to court to testify? So, to corroborate her testimony, the state is permitted to prove that, outside of court, she had earlier complained of the injury done her.

"This evidence is admitted solely to corroborate her testimony in court. It is to be considered by you only in determining the weight and credibility you will give to her testimony; and, in determining the extent you find corroboration in her out-of-court statements, you should carefully consider all the circumstances under which they were made. You should particularly consider whether she has been constant and consistent in what she has said. To the extent she has been consistent in what she has said, you may find her testimony in court to be corroborated or supported. To the extent she

sation instruction. In that instruction, the trial court told the jury the following: "As you know, statements made out of court by a party are generally not admissible. . . . Now there are, of course, exceptions to that general rule. . . . [T]he State is permitted to prove that outside of court, [the victim] made complaints of the events involved here, the things allegedly done to her, for the sole purpose of corroborating her testimony [in court]. In determining the extent of such corroboration by her out-of-court statements made, you will carefully consider all the circumstances under which they were made, and particularly, you should consider whether she has been constant and consistent in what she has said. The extent to which you may use her out-of-court statements is quite limited. You may not use what she said out of court to establish any of the charges against the Defendant or to establish any of the elements of any of these charges. You may only use her out-of-court statements for the purpose of determining or helping you to determine the credibility of her in-court testimony regarding the events of July 9, 1991."[11] In addition to having filed a request

has been inconsistent in what she has said, you may consider the degree of inconsistency which you find, and you may consider the reasons why you find for the inconsistency, in evaluating her testimony.

"I will tell you that as the triers of fact in this case you determine the weight a particular witness' testimony deserves. If a witness has shown to have testified falsely concerning any material matter, you have a right to distrust such witness' testimony on other particulars. You may reject all of the testimony of that witness or give it such credibility as you think it deserves."

[11] The entire constancy of accusation instruction is as follows: "As you know, statements made out of court by a party are generally not admissible. That is because the statements lack the support of the oath which a witness takes in court. Now, there are, of course, exceptions to that general rule. And we have one of them in this case.

"The complaining witness here, [the victim], has testified here in court as to the offenses the State—and she claims—were committed upon her. Now, if that was all that was present before you, you would ask yourselves why did she keep silent about it until she came before the court to testify.

to charge pursuant to Practice Book § 852,[12] the defendant took proper exception to the trial court's failure to give the requested constancy of accusation instruction.[13]

So the State is permitted to prove that outside of court, she made complaints of the events involved here, the things allegedly done to her, for the sole purpose of corroborating her testimony.

"In determining the extent of such corroboration by her out-of-court statements made, you will carefully consider all the circumstances under which they were made, and particularly, you should consider whether she has been constant and consistent in what she has said.

"The extent to which you may use her out-of-court statements is quite limited. You may not use what she said out of court to establish any of the charges against the Defendant or to establish any of the elements of any of these charges. You may only use her out-of-court statements for the purpose of determining or helping you to determine the credibility of her in-court testimony regarding the events of July 9, 1991.

"I emphasize that your determination as to whether the State has proved the defendant guilty of any one or more of the four charges by proof beyond a reasonable doubt of each element of the charge must be based on in-court testimony and not on any out-of-court statements."

[12] Practice Book § 852 provides: "The supreme court shall not be bound to consider error as to the giving of, or the failure to give, an instruction unless the matter is covered by a written request to charge or exception has been taken by the party appealing immediately after the charge is delivered. Counsel taking the exception shall state distinctly the matter objected to and the ground of objection. Upon request, opportunity shall be given to present the exception out of the hearing of the jury."

[13] The defendant took the following exception to the court's charge: "And then, Your Honor, on Your Honor's charge on constancy, Your Honor, if I may, which is your page 20, the second paragraph, you said, I emphasize that your determination of whether the State has proven the Defendant guilty of any one or more of the four charges proved beyond a reasonable doubt, and each element of each charge must be based on her in-court testimony and not her out-of-court testimony. And my claim, Your Honor, is that pursuant to my request on inconsistent statements, that the jury be allowed to utilize prior inconsistent statements especially given the indicia reliability of these statements, and that the jury also be instructed that they may, in fact, consider them.

"Your Honor indicates on pages 19 that the out-of-court statements cannot be used to establish the charges against the Defendant, and I agree that that is a correct assertion of the law, but the jury may utilize those in determining the corroboration of the out-of-court statements with the in-court testimony as to whether or not there was, in fact, consent here, and it's part of the defense."

Before addressing the merits of this claim, we must make clear what the defendant does not argue. The defendant, although sharply critical of the constancy of accusation doctrine, does not ask us to abolish it entirely. To the extent that the state identifies the claim as such, it mischaracterizes the claim. Rather, the defendant claims that, because the trial court did not caution the jury that constancy of accusation testimony can be used to impeach as well as to corroborate the victim's testimony, and because the trial court failed in its other instructions to charge the jury that in assessing her credibility it could consider any contradictions, inconsistencies or falsities in the victim's out-of-court statements, the court failed to provide a proper balance to the instructions.

"When reviewing the challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper. . . . *Blanchette* v. *Barrett*, 229 Conn. 256, 280–81, 640 A.2d 74 (1994)." (Citations omitted; internal quotation marks omitted.) *State* v. *Leroy*, 232 Conn. 1, 8, 653 A.2d 161 (1995).

When a defendant challenges the trial court's failure to provide a requested charge, or some other impropriety in the jury instructions, one of two separate and distinct legal standards of review is used. If the claimed omission or impropriety is of constitutional dimension,

we must be convinced that there is no reasonable possibility that it affected the verdict. *State* v. *Munoz*, 233 Conn. 106, 120, 659 A.2d 683 (1995). When the error is merely of an evidentiary nature, then the defendant must prove that it was reasonably probable that the jury was misled. *State* v. *Mason*, 186 Conn. 574, 585–86, 442 A.2d 1335 (1982). Although the defendant suggests that this claimed error is of constitutional dimension, his argument is premised on the aspersions he casts on the constancy of accusation rule that "invests the testimony of the complainants in sexual assault cases with an unassailable sanctity that no other witness' testimony enjoys." The defendant's criticism of the rule does not, however, shroud his claim in a constitutional cloak. Therefore, we examine the trial court's instructions to determine whether they fairly presented the case with sufficient guidance, were correct in law and adapted to the issues. If we conclude that the instructions failed to meet these standards, then we must consider whether the defendant has demonstrated that it was reasonably probable that the jury was misled.

The state offered constancy of accusation testimony to corroborate the victim's in-court testimony. This does not preclude the defendant from using any inconsistencies in that testimony to impeach the victim. Indeed, as one of the justifications for the continued viability of the doctrine in our jurisprudence, we have noted that there may be instances in which defendants gain greater advantage from the inconsistencies in the victim's various statements than the state does from the corroboration. "Under our constancy of accusation exception the complainant and those to whom she complained are permitted to testify to both the complaint and its details. Rather than disadvantaging a defendant, such a doctrine supplies a fertile field for cross-examination of a complainant with reference to ascertaining where the truth lies. In *Bishop* v. *Copp*, 96 Conn.

571, 575, 114 A. 682 (1921), Chief Justice Wheeler said: 'The test of cross-examination is the highest and most indispensable test known to the law for the discovery of truth.' Wigmore, speaking even more strongly, said that cross-examination 'is beyond any doubt the greatest legal engine ever invented for the discovery of truth.' 5 Wigmore, Evidence (Chadbourn Rev. 1974) § 1367, p. 32." *State* v. *Dabkowski*, 199 Conn. 193, 202, 506 A.2d 118 (1986); see also *State* v. *Kelley*, 229 Conn. 557, 566, 643 A.2d 854 (1994). The ability of the defendant to use the victim's statements to others for impeachment purposes, however, is impaired if, ignoring a timely request, the trial court either in its instructions on constancy of accusation or elsewhere in its instructions on credibility does not specifically inform the jury of its ability to rely on the inconsistencies and contradictions in the victim's testimony to discredit her in-court testimony. This is a rudimentary legal principle that required mention.

Despite the four separate requests to charge on this point, the trial court failed to instruct the jury that it could use the constancy of accusation testimony to impeach the victim. Moreover, although the court informed the jury that it could use the constancy of accusation testimony for credibility, it did so in the context of an instruction regarding the limited admissibility of out-of-court statements, in which it had stated that there was an exception to the rule in this case because the state had used the statements "for the sole purpose of corroborating" the victim's testimony. This, in effect, told the jury not to use the prior inconsistent statements for any reason other than corroboration. "The jury is presumed to follow the court's instructions absent a clear indication to the contrary." (Internal quotation marks omitted.) *State* v. *Raguseo*, 225 Conn. 114, 131, 622 A.2d 519 (1993).

Without proper guidance from the court, the jury did not know that it could use the inconsistencies elicited during the trial and highlighted during closing argument to impeach the victim's credibility. Therefore, the charge as a whole failed properly to instruct the jury to assess the evidence in connection with its duty to gauge the victim's credibility. In light of the entire instructions, in which the trial court never mentioned impeachment by prior inconsistent statements, there is a reasonable probability that the jury was misled about its ability to use such evidence for impeachment purposes. Because this case distilled to a credibility contest between the defendant and the victim, we conclude that it is more probable than not that the action of the trial court affected the result. *State* v. *Jones*, 205 Conn. 723, 732, 535 A.2d 808 (1988).

## III

Although we have reversed the judgment and ordered a new trial on all counts, there are two additional issues that require resolution because they are likely to recur in the new trial. The defendant claims that the trial court impermissibly allowed the state to introduce evidence of the events in Mount Vernon, New York, that had immediately preceded the incident in New London. The defendant also argues that the trial court impermissibly allowed expert testimony concerning the percentage of sexual assaults that victims report and the frequency of delays in such reporting. Because we anticipate that the state will seek to introduce both categories of evidence, we decide these claims to provide guidance to the trial court.[14]

## A

The defendant claims that the trial court improperly denied his motion in limine to exclude testimony con-

[14] The defendant also claims that the trial court, in various ways, incorrectly instructed the jury on kidnapping. We need not address these claims because it is not likely that they will recur.

cerning the events in Mount Vernon, New York, that preceded the alleged crimes in New London. The defendant sought to preclude the testimony of Corigliano and Corcione regarding what they had witnessed on July 9, 1991, in Mount Vernon. In particular, the defendant argued at trial that the prejudice he would suffer as a result of the admission of any evidence about a machete would far outweigh its probative value. The trial court heard argument by the state that it intended to introduce evidence about what had transpired in New York, four hours prior to the incident in Connecticut, because of its relevance to the issues of malice, motive and intent. The trial court denied the defendant's motion in limine without stating the basis for its ruling.

When the state first introduced, through its first witness, the victim, the evidence about what had occurred in New York, the defendant objected and renewed his motion in limine. The court overruled the objection. The evidence about what Corcione and Corigliano had seen then came in without objection. After the victim testified that the defendant had never displayed the machete during the incident in New London, however, the defendant moved to strike their testimony. The trial court denied that motion as well. After the close of the state's case, the defendant again moved to strike all testimony relating to the machete, and failing that, for the court to declare a mistrial. In denying both motions, the court declared that "everything that had happened in Mount Vernon . . . was continual . . . probative of what was going on in at least the minds perhaps the viscerals of the parties."

On appeal, the defendant confines his argument to evidence of the machete and argues that the machete "had nothing to do with the crime that is alleged to have occurred in Connecticut," and that it was introduced as "simply an attempt to portray the defendant in an unfavorable light and to suggest that he had acted

in Connecticut in conformity with the manner that [the victim] claimed that he had acted in New York." We agree with the argument made by the state to the trial court that the evidence regarding the events in Mount Vernon was highly relevant, and that the trial court did not abuse its discretion in balancing its probative value against its prejudicial effect.

In *State* v. *Baldwin*, 224 Conn. 347, 355, 618 A.2d 513 (1993), we stated that "[t]he law regarding admission of prior criminal acts is clear. 'As a general proposition, evidence of guilt of other crimes, because of its prejudicial nature, is inadmissible to prove that a defendant is guilty of the crimes with which he is charged. *State* v. *Holliday*, 159 Conn. 169, 172, 268 A.2d 368 (1970); *State* v. *Harris*, 147 Conn. 589, 599, 164 A.2d 399 (1960). Such evidence is admissible for other purposes, however, such as when it is particularly probative in showing such things as intent, an element in the crime, identity, malice, motive or a system of criminal activity, to name some exceptions to the rule. *State* v. *Brown*, 169 Conn. 692, 701, 364 A.2d 186 (1975). The trial judge, however, must determine in the exercise of judicial discretion that its probative value outweighs its prejudicial tendency. *State* v. *Moynahan*, [164 Conn. 560, 597, 325 A.2d 199, cert. denied, 414 U.S. 976, 94 S. Ct. 291, 38 L. Ed. 2d 219 (1973)]; *State* v. *Holliday*, supra, 173.' "

We have stated that misconduct evidence may be used to complete the story of the charged crime "by placing it in the context of nearby and nearly contemporaneous happenings." (Internal quotation marks omitted.) *State* v. *Cooper*, 227 Conn. 417, 424–25, 630 A.2d 1043 (1993). " 'Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done. *State* v. *Hauck*, 172 Conn. 140, 144, 374 A.2d 150 (1976); *Thomas* v. *Thomas*, 159 Conn. 477, 480, 271 A.2d 62 (1970); 1 Wharton, Crimi-

nal Evidence (13th Ed.) § 241.' *State* v. *Turcio,* 178 Conn. 116, 129, 422 A.2d 749 (1979), cert. denied, 444 U.S. 1013, 100 S. Ct. 661, 62 L. Ed. 2d 642 (1980).'' *State* v. *Baldwin,* supra, 224 Conn. 354-55.

The evidence in question was relevant to place in context the events that followed in New London. See *State* v. *Silva,* 201 Conn. 244, 249, 513 A.2d 1202 (1986); *State* v. *Brown,* 199 Conn. 47, 56, 505 A.2d 1225 (1986); *State* v. *Smith,* 198 Conn. 147, 157-58, 502 A.2d 874 (1985). The defendant's use of the machete during the prior incident tended to explain why the victim was afraid of the defendant and why she feared for her safety and that of her children. It also showed, at the very least, that the defendant had used a knife to engage in forceful conduct toward the victim and therefore was evidence that the parties' subsequent activities were not consensual. See *State* v. *Wilson,* 199 Conn. 417, 449, 507 A.2d 1367 (1986); *State* v. *Perry,* 195 Conn. 505, 522, 488 A.2d 1256 (1985).

The defendant argues, in effect, that because he did not use a machete in New London, evidence of its use in New York was not probative of a common scheme and, therefore, that its prejudicial effect outweighed its probative value. We conclude, to the contrary, that this evidence was probative on the issues of force, physical threat of force and compulsion, and we cannot conclude that the trial court abused its discretion in concluding that its relevance outweighed any prejudicial effect. We therefore reject the defendant's claim.

### B

The defendant next argues that the trial court, despite his timely objection, impermissibly allowed Barbara Schectman, the clinical director of counseling in advocacy services at the Women's Center of Southeastern Connecticut, to testify regarding the general characteristics of women who delay reporting sexual assault. We disagree.

As part of the state's offer of proof outside the presence of the jury, the trial court heard the following evidence. For seventeen years, Schectman had been the clinical director of the center where her duties included the supervision of counseling of the advocacy staff. She supervised child advocates, court advocates, counselors, shelter advocates, and also worked "one-on-one" with clients who would walk into the center in crisis. Schectman also performed educational outreach and training services at the Coast Guard Academy and Connecticut College in the area of sexual assaults, sexual harassment and "acquaintance rape." Her qualifications included a master's degree in marriage and family counseling and the publication of articles in the area of sexual abuse and sexual assault. In addition to her tenure at the center, Schectman had been in private practice for sixteen years working with individuals, couples and families. Approximately 25 percent of her practice involved sexual assaults and sexual abuse, and she had handled thousands of such cases. Schectman testified that she had never met the victim in this case, but that, in general, women are reluctant to report incidents of sexual assault, and that generally only 10 to 20 percent report their assaults to the police. Of those who do report, they often delay because they are embarrassed, humiliated and in shock. The trial court determined that this testimony was relevant, and overruled the defendant's objection.

In the presence of the jury, Schectman repeated her academic credentials, her list of publications and her experience in the treatment of victims of sexual harassment, sexual abuse and sexual assault. She testified that only approximately 10 to 20 percent of sexual assault victims actually report the incident, and that many such victims seek counseling because they have symptoms caused by the trauma. She added that it is common for women to delay reporting because they

are often in shock. When victimized women do disclose the incidents to friends or family, they are encouraged to report it, but in such instances the reporting is obviously already delayed. On the basis of her training and experience, Schectman concluded that women delay reporting because they have suffered "an incredible trauma," they are "shocked" and "immobilized," "embarrassed," "humiliated," feel "very, very dirty," and "do not feel comfortable."

On appeal, the defendant does not challenge Schectman's qualifications, her expertise based on her education or her experience in the area of counseling victims of sexual assault. See *State* v. *Borrelli,* 227 Conn. 153, 165, 629 A.2d 1105 (1993). Further, he does not challenge her competency to offer an opinion based on her lack of personal knowledge of the victim. He also does not assert that her testimony concerning rape trauma syndrome did not satisfy the test set forth in *Frye* v. *United States,* 293 F. 1013 (D.C. Cir. 1923).[15] See *State* v. *Hasan,* 205 Conn. 485, 491, 534 A.2d 877 (1987). The defendant essentially claims that Schectman's testimony failed to assist the trier of fact in determining his guilt or innocence because "her experience . . . was not applicable to a case in which the complainant testified that her delay arose not from shock or psychological distress but rather because of an alleged straightforward death threat. If [the victim's] claim concerning [the defendant's] threat is credible, one needs no more than the knowledge possessed by every average person that one may indeed hesitate

---

[15] In *State* v. *Borrelli,* supra, 227 Conn. 163, this court held that the *Frye* test requires that "when scientific expertise is offered, the subject matter of the testimony must be sufficiently established to have gained general acceptance in the particular field in which it belongs." (Internal quotation marks omitted.) The defendant also does not argue that this case requires consideration of the viability of the *Frye* test in light of *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

to perform [an] act if threatened with death should that act be performed." We disagree.

"Expert testimony should be admitted when: '(1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues.' *State* v. *Rodgers*, 207 Conn. 646, 651, 542 A.2d 1136 (1988); *State* v. *Kemp*, 199 Conn. 473, 476, 507 A.2d 1387 (1986). We review claims of improper admission of expert testimony under an abuse of discretion standard. *State* v. *Kemp*, supra [476]; *State* v. *Girolamo*, 197 Conn. 201, 214, 496 A.2d 948 (1985); *State* v. *Biller*, 190 Conn. 594, 617, 462 A.2d 987 (1983)." *State* v. *Freeney*, 228 Conn. 582, 591, 637 A.2d 1088 (1994).

This case is controlled by our recent decisions in *State* v. *Borrelli*, supra, 227 Conn. 153, and *State* v. *Freeney*, supra, 228 Conn. 582. "In *Borrelli*, before trial the victim gave the police a written sworn statement that she had been tied up and sexually abused by the defendant. She later contradicted her statement at trial. [*State* v. *Borrelli*, supra] 158–59. To explain her inconsistent testimony, the state presented an expert, Evan Stark, a sociologist, who testified that battered women will often recant earlier accusations in an attempt to mend their relationship with the batterer. Id., 168. On appeal, the defendant argued that Stark's testimony should not have been admitted. We concluded, however, that 'Stark's expert testimony was properly admitted to assist the jury in understanding, not whether [the victim] was a credible witness on the witness stand, but whether her conduct . . . was consistent with the pattern and profile of a battered woman. . . . [T]he expert testimony did not invade the province of the jury in determining the credibility of witnesses.' (Citation

omitted; internal quotation marks omitted.) Id., 174."
*State* v. *Freeney,* supra, 228 Conn. 591–92.

Similarly, in *Freeney,* "the victim testified that the defendant had restrained her, had repeatedly beat her, and had forced her to engage in intercourse with strangers. The psychology of a victim of such abuse, is in all likelihood . . . beyond the jury's experience and knowledge. [*State* v. *Borrelli,* supra, 227 Conn.] 173–74 (explanations for why a victim of sexual abuse would recant accusation are outside jury's experience); see also *State* v. *Spigarolo,* 210 Conn. 359, 378, 556 A.2d 112, cert. denied, 493 U.S. 933, 110 S. Ct. 322, 107 L. Ed. 2d 312 (1989) (trauma experienced by minor victims of sexual abuse is beyond the understanding of the average person).

"The sole purpose of the experts' testimony was to establish that the victim's behavior was generally consistent with that of a victim of sexual or physical abuse. The distinction between testimony about the general behavior of victims and an opinion as to whether the instant victim is telling the truth is critical. See *State* v. *Borrelli,* supra, [227 Conn.] 173 (there is a critical distinction between admissible expert testimony on general or typical behavior patterns of . . . victims and inadmissible testimony directly concerning the particular victim's credibility), quoting *State* v. *Spigarolo,* supra, [210 Conn.] 379. In this instance, neither expert gave an opinion as to whether this particular victim had told the truth or whether she had in fact suffered physical or sexual abuse. The expert testimony that a victim of sexual or physical abuse might not necessarily attempt to escape, and might recount the circumstances of the abuse in a disjointed fashion, could have assisted the jury substantially in determining the central issue in the case—whether the defendant had restrained and assaulted the victim against her will. Accordingly, we conclude that the admission of the expert testimony

was within the trial court's discretion." (Internal quotation marks omitted.) *State* v. *Freeney,* supra, 228 Conn. 592–93.

In the present case, the state offered Schectman's testimony after the victim had been questioned about her delay in reporting the incident. In order to provide an interpretation of the facts that a lay jury might not have perceived because of its lack of experience with victims of rape and rape trauma syndrome, the trial court allowed Schectman to testify to rebut impeachment of the victim based on common misconceptions about victims of sexual abuse. We have held that such evidence falls within the permissible purpose of social framework testimony. See *State* v. *Spigarolo*, supra, 210 Conn. 377 (not unusual for children who have been victim of sexual abuse to give inconsistent or incomplete accounts of alleged incidents).

We agree with the state that Schectman's testimony focused on a subject that generally is not within the common knowledge and experience of the average juror. On the basis of her extensive experience with sexual assault complainants, she presented a general description of characteristics that are common among such women. Further, her testimony was consistent with the theory of rape trauma syndrome as it has been presented and discussed in other cases of this court; see *State* v. *Christiano*, 228 Conn. 456, 464, 637 A.2d 382, cert. denied, U.S. , 115 S. Ct. 83, 130 L. Ed. 2d 36 (1994); as well as in scholarly commentary. See R. Andrias, "Rape Myths: A Persistent Problem in Prosecuting Rapes," 7 A.B.A. Criminal Justice 2 (1992); note, "Defining the Boundaries of Admissible Expert Psychological Testimony on Rape Trauma Syndrome," 1989 U. Ill. L. Rev. 691 (1989); Frazier & Borgida, "Juror Common Understanding and the Admissibility of Rape Trauma Syndrome Evidence in Court," 12 Law and Hum. Behav. 115 (1988).

This type of testimony has also been accepted by many courts when the testimony has been offered, as in this case, to explain a reporting delay; see, e.g., *People* v. *Dunnahoo*, 152 Cal. App. 3d 561, 577, 199 Cal. Rptr. 796 (1984); *Powell* v. *State*, 527 A.2d 276, 278–79 (Del. 1987); or to explain the victim's reluctance to reveal or talk about the crime. *People* v. *Gray*, 187 Cal. App. 3d 213, 218, 231 Cal. Rptr. 658 (1986); *People* v. *Benjamin R.*, 103 App. Div. 2d 663, 669–70, 481 N.Y.S.2d 827 (1984). We conclude that "expert testimony on [rape trauma syndrome] may . . . disabus[e] the jury of some widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths." *People* v. *Bledsoe*, 36 Cal. 3d 236, 247–48, 681 P.2d 291, 203 Cal. Rptr. 450 (1984).

We further conclude, therefore, that the trial court did not abuse its discretion in deciding that Schectman's testimony in this case would be helpful to the jury. Because her testimony was focused on a subject not completely familiar to the average person, it reasonably could have aided the jury in gauging the victim's credibility. The jury heard that the victim did not immediately report the sexual assault, although she had been sufficiently assertive to call the police during the Mount Vernon altercation. Schectman's testimony was useful to explain why the victim, having immediately called the police about the altercation in New York, was nevertheless incapable, or at least reluctant, to report the defendant's conduct to the police after the sexual assault.

The defendant argues that if the jury believed the victim's testimony that he had threatened to kill her if she reported the incident, then no expert was needed to explain that such a threat was a powerful incentive. Quite obviously, the jury, however, was not required to believe that testimony, in which case it would still

have needed to interpret the delay. Schectman's testimony enabled the jury to find that if the victim had suffered a sexual assault, such a finding was not necessarily inconsistent with her delay in reporting it to the authorities. Schectman's testimony narrowly focused on a subject not familiar to the average person and "it was relevant and material to the performance of the jury's function of gauging the credibility of the victim." *State* v. *Christiano*, supra, 228 Conn. 462.

The judgment is reversed and the case is remanded for a new trial.

In this opinion PETERS, C. J., and BORDEN and PALMER, Js., concurred.

CALLAHAN, J., dissenting in part II of the majority opinion. I agree with the majority that the trial court, in response to the defendant's requests, should have instructed the jury that it could use the victim's prior statements, which the state had elicited as constancy of accusation evidence, to impeach the victim's credibility if it found her statements to be inconsistent with each other or with her trial testimony. It seems to me, however, that a necessary unspoken corollary of the instruction that the trial court did give, i.e., that the jury could use the victim's prior consistent statements to corroborate her testimony, is the proposition that the statements, if found inconsistent, necessarily would detract from that testimony. We would have to credit the jurors with very little in the way of common sense to conclude that unless they explicitly were told to do so, they would not consider any inconsistencies in the victim's statements in assessing her credibility.

The majority, as a basis for its decision, adverts to the trial court's instruction that the "sole purpose" for the admission of the victim's prior statements was to corroborate her testimony, thereby ruling out the use

of her prior statements for impeachment purposes. The instruction, however, clearly was given in a context that informed the jury that it simply could not use constancy of accusation testimony as substantive evidence.[1] The instruction reasonably understood would not have conveyed the idea, or created the impression, that any prior inconsistent statements of the victim had to be ignored in determining the credibility of her trial testimony.

In fact, as part of its constancy of accusation instruction the trial court stated: "You may only use her out-of-court statements for the purpose of determining or helping you to determine the *credibility* of her in-court testimony regarding the events of July 9, 1991." (Emphasis added.) It is not reasonable to conclude that, given this instruction, if the jury found the prior statements of the victim to be inconsistent, it simply would disregard the inconsistencies. Rather, consistent with the court's instruction, the inconsistencies inevitably would factor into the jury's determination of the victim's credibility. Moreover, in his final argument to the jury, the defendant diluted any possible restrictive implications of the court's charge by emphasizing the inconsistencies in the victim's statements and arguing to the jury that because of those inconsistencies, she should not be believed.

Because the impropriety claimed was not constitutional, the burden was upon the defendant to demonstrate its harmfulness. See *State* v. *Rinaldi*, 220 Conn. 345, 357, 599 A.2d 1 (1991); *State* v. *Flanders*, 214 Conn. 493, 502, 572 A.2d 983, cert. denied, 498 U.S. 901, 111 S. Ct. 260, 112 L. Ed. 2d 217 (1990); *State* v. *Ruth*, 181 Conn. 187, 196–97, 435 A.2d 3 (1980). I believe he has failed to carry that burden.

---

[1] Indeed, the defendant's own request to charge on constancy of accusation states in relevant part: "This evidence is admitted *solely* to corroborate her testimony in court." (Emphasis added.)